IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MAXWELL SHOE COMPANY, INC.,

         Plaintiff,

v.

EDELMAN SHOE COMPANY, LLC and
SAM EDELMAN

         Defendants.

Civil Action No. 04-10694 RCL

## DECLARATION OF KENNETH SITOMER

I, Kenneth Sitomer, hereby declare as follows:

1.     I am a principal of Apparel Holdings Group LLP.

2.     In 1996, I was Chief Operating Officer and Chief Financial Officer of Sam & Libby, Inc.

3.     I have first hand knowledge of the matters addressed below.

4.     I, together with Sam Edelman and our company's legal counsel, negotiated the terms of the Trademark and Intellectual Property Rights Purchase and Sale Agreement (the "Trademark Purchase Agreement") concerning the sale of the SAM & LIBBY trademark to Maxwell Shoe Company Inc. in 1996.  In fact, I executed the Agreement on behalf of our company.  It is my understanding that the Trademark Purchase Agreement and Mr. Edelman's current use of his name in connection with the marketing of women's footwear are the subject of the above-captioned lawsuit.  A true copy of the Trademark Purchase Agreement is attached hereto as Exhibit A.

5.    The negotiation of the Trademark Purchase Agreement took place over a number of months. During that time, I negotiated with two officers of Maxwell Shoe, Mark Cocozza, CEO, and James Tinagero, whom, to the best of my recollection, was the in-house head of mergers and acquisitions.

6.    I recall that the plaintiff, Maxwell Shoe, initially did not want Sam Edelman or Libby Edelman to use their names in connection with the marketing of shoes at any time after the sale of the SAM & LIBBY trademark. We informed Maxwell that Mr. Edelman was emphatic that he would not sell the SAM & LIBBY trademark if he could not use his name in connection with the sale of footwear in the future. Maxwell's representatives were well aware of the fact that Mr. Edelman reputation in the fashion footwear field was legendary and that he would never enter into any agreement which forever prohibited him from using his name on or in connection with the sale of footwear. I explained to Maxwell's representatives that since Mr. Edelman had spent his entire professional career in shoe business and had an established national reputation as a footwear designer, he must be free to use his name in the future in connection with marketing of footwear.

7.    In an effort to reach an agreement for the sale of the SAM & LIBBY trademark, the parties agreed Sam Edelman and Libby Edelman would not use their names or any similar names in or on footwear and apparel products for a limited period of three years. We thought that the three-year time restriction would be sufficient for Maxwell Shoe to distance the Sam & Libby brand from Mr. and Mrs. Edelman and at the same time such a time limitation would not place an unreasonable restriction on the Edelmans right to use their names in the footwear field.

8.     I am surprised and perplexed that Maxwell Shoe has brought this lawsuit seeking to enjoin Mr. Edelman from using his name in or on footwear products since the Trademark Purchase Agreement which was negotiated clearly permitted him to use his name for this purpose.  Mr. Edelman's freedom to use his name was the subject of much   discussion during the negotiations and was an important condition of the Trademark Purchase Agreement.  There is no doubt in my mind that Mr. Edelman is now free to use his name in connection with the sale of footwear since more than three years have passed since the execution of the Trademark Purchase Agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 14, 2004

_____
Kenneth Sitomer

# EXHIBIT A



## TRADEMARK AND INTELLECTUAL PROPERTY RIGHTS
## PURCHASE AND SALE AGREEMENT

This TRADEMARK AND INTELLECTUAL PROPERTY RIGHTS PURCHASE AND SALE AGREEMENT (this "Agreement") is made and entered into as of this 2nd day of July, 1996 by and among SAM & LIBBY, INC., a California corporation ("Seller"), and with respect to those sections of this Agreement referenced below the signatures of each of the Shareholders (as defined below) on the signature page of this Agreement, SAMUEL L. EDELMAN, individually and as trustee of any and all trusts for which he serves as trustee which may hold shares of Seller's capital stock and have voting rights of such stock, LOUISE B. EDELMAN, individually and as trustee of any and all trusts for which she serves as trustee which may hold shares of Seller's capital stock and have voting rights of such stock, and STUART L. KREISLER individually (collectively, the "Shareholders"), and MAXWELL SHOE COMPANY INC., a Delaware corporation ("Buyer").

### RECITALS:

A.     Seller is the owner of each of those certain trademarks, trade names, service marks, logos and common law and similar rights used and/or registered in the United States and worldwide (the "Trademarks"), as identified on Exhibit A attached hereto.

B.     Subject to the terms and conditions set forth herein, Seller desires to sell to Buyer ownership rights to each of the Trademarks and all rights associated therewith and Buyer desires to acquire the same.

### AGREEMENT:

NOW, THEREFORE, in consideration of the premises and the mutual promises contained herein, the parties hereto covenant and agree as follows:

1.     <u>Agreement to Sell and Purchase.</u>  On the terms and subject to the conditions set forth in this Agreement, on the Closing Date (as defined below) the Seller shall convey, transfer, assign, sell and deliver to Buyer, and Buyer shall acquire, accept and purchase, all right, title, benefit and interest in and to the Trademarks together with the goodwill symbolized by and associated with the Trademarks.

2.     <u>Consideration to be Paid by Buyer.</u>  The purchase price for the Trademarks shall be $5.5 million cash (the "Purchase Price").  Buyer agrees to pay: (i) on or before July 8, 1996 the amount of $200,000 (the "Initial Payment"), to be held in escrow until the Closing (as defined below) by a third person mutually satisfactory to Buyer and Seller; and (ii) at Closing (as defined below) the amount of $5.1 million, with the remaining $200,000 of the Purchase Price (the "Balance Payment") to be paid on April 30, 1997, such Balance Payment to be made only if all of Seller's and all of the Shareholders' material obligations under this Agreement have been satisfied in full.  In the event Buyer does not deliver the Initial Payment into an escrow account on or

before July 8, 1996, Buyer shall deliver the Initial P_, inent to Seller in full in cash on or before July 10, 1996.

3.    No Assumption of Liabilities.  Buyer and Seller hereby acknowledge and agree that Buyer shall not assume or be obligated to perform any liabilities or obligations of Seller, or any related or affiliated party, whether express, implied, fixed, accrued, contingent, liquidated or unliquidated, known or unknown, whether presently in existence or arising hereafter.

4.    Closing.  The closing of the transactions herein contemplated shall, unless another date, time or place is agreed to in writing by the parties hereto, take place at the offices of Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York, no later than two business days after the shareholder meeting referred to in Section 10.1 below, but in no event later than September 4, 1996 (the "Closing" or "Closing Date"), if all conditions to closing shall have been fulfilled on or before such date.

5.    Method of Payment.  All funds to be delivered to Seller at Closing shall be delivered by wire transfer in immediately available funds to an account of Bank of New York Financial Corporation, or its applicable affiliate ("Bank of New York"), for the benefit of Seller, which account shall be designated by Seller in writing at least two business days prior to the Closing Date.  The Balance Payment to be delivered to Seller on April 30, 1997 shall be delivered by wire transfer in immediately available funds to an account of Bank of New York for the benefit of Seller, which account shall be designated by Seller in writing at least two business day prior to April 30, 1997.

6.    Representations and Warranties of Seller.  Seller represents and warrants to Buyer that:

6.1    Organization and Good Standing.  Seller is duly organized, validly existing and in good standing under the laws of the State of California and is qualified to do business in all jurisdictions where Seller's operations require same which would have a material impact on any of the Transactions (as defined below).

6.2    Authorization of Agreement.  Subject to obtaining any required approval of the holders of the shares of capital stock of Seller, Seller has, and has obtained, all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.  Subject to obtaining any required approval of the holders of capital stock of Seller, this Agreement and all other agreements and instruments to be executed by Seller in connection herewith have been (or upon execution will have been) duly executed and delivered by Seller, have been effectively authorized by all necessary action, corporate or otherwise, and constitute (or upon execution will constitute) legal, valid and binding obligations of Seller, enforceable against Seller in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, arrangement, fraudulent conveyance, moratorium or other laws relating to or affecting the rights of creditors generally.

6.3    Title to Trademarks.  Except as set forth on Schedule 6.3, Seller has full and unrestricted title in all jurisdictions as set forth on Exhibit A to each of the Trademarks, free


and clear of any liens, mortgages, encumbrances, security interests or third party claims of any kind ("Liens") and at Closing Buyer shall own in fee undisputed and unrestricted title to the Trademarks, free and clear of any and all Liens.

6.4    Agreement Not in Breach of Other Instruments.  Subject to the consent of Bank of New York, the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the fulfillment of the terms hereof will not result in a breach of any of the terms or provisions of, or constitute a default under, or conflict with, any material agreement, indenture or other instrument to which Seller is a party or by which it is bound, Seller's Articles of Incorporation or bylaws, any judgment, decree, order or award of any court, governmental body or arbitrator, or any law, rule or regulation applicable to Seller or the Trademarks.

6.5    Consents of Third Parties and Regulatory Approval.  Except for the consent of Bank of New York, and the approval by Seller's shareholders, no consents of any third parties are required to consummate the transactions contemplated by this Agreement.  No consent, approval, authorization, order, registration, qualification or filing of or with any court or any regulatory authority or any other governmental or administrative body is required on the part of Seller for the consummation by it of the transactions contemplated by this Agreement.

6.6    The Trademarks.  Exhibit A to this Agreement is a schedule of all the Trademarks, their registrations owned or utilized by Seller, and pending applications therefor, or in which Seller has any rights or licenses worldwide, together with the current status and a brief description of each.  All Trademarks, registrations and applications listed on Exhibit A to this Agreement are valid, enforceable and subsisting, and have not been abandoned or canceled and have not expired.  Seller has full title and ownership in and rights to utilize all the Trademarks necessary for or used in its business as now or previously conducted without any infringement of the rights of others.  Seller has not received any communications nor is it aware of any entity alleging that Seller has infringed upon or, by conducting its business as currently conducted, would infringe upon, nor is Seller aware that by conducting Seller's business Seller would infringe upon any intellectual property right of any other person or entity.  Seller is not aware of any infringement of the Trademarks by third parties and Seller has used and uses its commercially reasonable best efforts to prevent any infringement of the Trademarks by third parties.  None of the Trademarks is the subject of, or will be affected by, any existing action, proceeding, claim, demand or judgment to which Seller is a party or of which it is aware, the outcome of which could impair Buyer's ability to use the Trademarks in an unrestricted fashion.  Except as set forth in Exhibit A and Schedule 6.3 and except as contemplated by Section 9.1 of this Agreement, Seller is not a party to any license, agreement or arrangement, whether as licensor, licensee, franchisor, franchisee or otherwise, with respect to the Trademarks or applications for them. Seller owns or holds adequate licenses or other rights to use all of the Trademarks necessary for its business as now conducted by Seller, and that use does not, and will not violate any rights of others.  Seller has the power, right and authority to sell to Buyer all of the Trademarks and all such licenses or other rights.

6.7    Disclosure.  The information provided by Seller in this Agreement does not and will not, to Seller's knowledge, contain an untrue statement of a material fact or omit to state

a material fact required to be stated herein or therein or necessary to make the statements and facts contained herein or therein, in light of the circumstances under which they are made, not false or misleading. Copies of all documents heretofore or hereafter delivered or made available by Seller to Buyer pursuant hereto were or will be, to Seller's knowledge, complete and accurate records of such documents.

7. <u>Representation and Warranty of the Shareholders</u>. Each of the Shareholders represents and warrants to Buyer that:

7.1 <u>Ability to Vote Stock Without Restriction</u>. Such Shareholder has the absolute right or obligation, without any restrictions whatsoever, as of the date hereof, and will have such right or obligation at the shareholder meeting referenced in Section 10.1 below, to vote the number of shares of capital stock of Seller held by such Shareholder, as set forth below such Shareholder's signature on the signature page of this Agreement, in favor of the Transactions, as defined below. Each such Shareholder's shares of capital stock of Seller are not subject to any voting trust agreement or other contract, agreement, arrangement, commitment or understanding which prohibits such vote, including any such agreement, arrangement, commitment or understanding restricting or otherwise relating to the voting of such Shareholder's shares, except as contemplated by Section 10.5 of this Agreement.

8. <u>Representations and Warranties of Buyer</u>. Buyer represents and warrants to Seller that:

8.1 <u>Organization and Good Standing</u>. Buyer is duly organized, validly existing and in good standing under the laws of the State of Delaware and is qualified to do business in all jurisdictions where Buyer's operations require same.

8.2 <u>Authorization of Agreement</u>. Buyer has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. This Agreement and all other agreements herein contemplated to be executed by Buyer in connection herewith have been (or upon execution will have been) duly executed and delivered by Buyer, have been effectively authorized by all necessary action, corporate or otherwise, and constitute (or upon execution will constitute) legal, valid and binding obligations of Buyer.

9. <u>Certain Understandings and Agreements of the Parties</u>.

9.1 <u>License to Seller</u>.

(a) On the Closing Date, Buyer agrees to license to Seller, for the consideration of $1.00 payable to Buyer at Closing, the Trademarks listed in Exhibit B to this Agreement (the "License") for the sole purpose to allow Seller to: (i) sell its existing inventory as listed in Exhibit C to this Agreement (the "Inventory"); and (ii) fill its customer orders outstanding as of the Closing Date and as shown in Exhibit D to this Agreement from those purchase orders as shown in Exhibit C to this Agreement. The License shall be effective for the period commencing from the Closing Date through and including April 30, 1997. In the



event Seller has not sold and shipped the Inventory to independent third parties on or before April 30, 1997, Seller agrees to remove or cause to be completely illegible any and all Trademarks from or on the remaining Inventory. Seller agrees that the quality of any and all goods and products Seller may manufacture pursuant to this Section 9.1(a) shall be the same or at least as good as the quality of similar goods and products manufactured by Seller prior and up to the date hereof.

(b)    Buyer and Seller agree that any proceeds derived from Seller's sale of the Inventory and from the filling of outstanding orders pursuant to Section 9.1(a) above shall belong to Seller.

(c)    Seller shall provide to Buyer within 15 days after the end of each month a written report containing inventory of footwear held or owned by Seller containing any Trademarks (by units and cost), inventory received during the month, shipments made by Seller of any such footwear during the prior month, to whom such footwear was sold and the prices for which such footwear was sold.

9.2    <u>Manufacture and Importation of Goods</u>. Except as set forth in Section 9.1(a), Seller agrees that after the Closing Date, it will not import nor manufacture domestically, nor market, sell or distribute, any goods or other products which bear, mention or note any of the Trademarks on such goods or products.

9.3    <u>Las Vegas Shoe Show</u>. Buyer agrees to reimburse Seller, on the Closing Date, the amount of $11,500, which represents the amount Seller has paid as a deposit for reservation of show space (the "Show Space") at the Western Shoe Association show in Las Vegas, Nevada in August 1996 (the "WSA Show"). In the event the Show Space may not be rented by Buyer, Seller agrees to act as Buyer's agent for purposes of renting the Show Space at the WSA Show for Buyer's use. In any event, Buyer and Seller agree that Buyer shall have use of and entitlement to the Show Space without interference by Seller at the WSA Show.

9.4    <u>Prototype Samples Expense</u>. Buyer agrees to reimburse Seller at Closing for Seller's Spring 1997 prototype samples expense which have been invoiced and paid by Seller in an amount not to exceed $17,000.

9.5    <u>Advertising and Point-of-Purchase Materials</u>. Buyer and Seller agree that all advertising, in-store point-of-purchase and promotional materials and displays located in all retail customer locations and Seller-owned retail locations shall belong solely to Buyer as of the Closing Date. In addition, Seller agrees to sell to Buyer at the Closing, at Buyer's option, point of purchase items, if Buyer desires to purchase such items, located in Seller's warehouse in Harrisburg, Pennsylvania, on which items any of the Trademarks appear, for a purchase price equivalent to 50% of Seller's cost of such items.

9.6    <u>Publicity</u>. Buyer, on the one hand, and Seller and the Shareholders, on the other hand, agree that until Closing, no public release or announcement concerning the transactions contemplated hereby shall be issued by either party without the prior consent of the other party (which consent shall not be unreasonably withheld), except as such release or

announcement may be required by law or the rules or regulations of any United States or foreign securities exchange, in which case the party required to make the release or announcement shall allow the other party reasonable time to comment on such release or announcement in advance of such issuance.

9.7    Consent of Bank of New York.  Between the date hereof and the Closing Date, Seller shall use all reasonable efforts to obtain the written consent of Bank of New York to all the transactions contemplated by this Agreement.

9.8    Recording of Buyer's Ownership Interest in Trademarks.  Buyer shall assume all obligations and bear all costs associated with recording its ownership interest in the Trademarks.  Seller shall execute and deliver to Buyer, at Buyer's expense, such instruments of sale, transfer, conveyance, assignment and delivery in recordable form, and consents, assurances, powers of attorney and other instruments as may be reasonably requested by counsel for Buyer in order to record with any government authority the transfer of ownership in the Trademarks from Seller to Buyer and to reflect termination of Seller's interest in the Trademarks, and Seller shall cause to be executed and delivered to Buyer, at Seller's cost, such releases and third party consents as may be reasonably necessary to deliver to Buyer all right, title and interest of Seller in and to the Trademarks free and clear of all Liens.

9.9    Further Assurances.  From time to time after the Closing, Seller will execute and deliver to Buyer such instruments of sale, transfer, conveyance, assignment and delivery, consents, assurances, powers of attorney and other instruments as may be reasonably requested by counsel for Buyer in order to vest in Buyer all right, title and interest of Seller in and to the Trademarks free and clear of all Liens and otherwise in order to carry out the purpose and intent of this Agreement.

9.10    Use of Certain Names.  Each of Buyer and Seller agrees that after July 25, 1996, neither will in any way utilize or display either of the names "Sam Edelman" or "Libby Edelman," or any names similar to such names, in or on any product of Buyer or Seller. Each of Samuel L. Edelman and Louise B. Edelman agree not to use either of the names "Sam Edelman" or "Libby Edelman," or any names similar to such names, appearing in or on any footwear product or apparel product for three years from July 25, 1996.

9.11    Removal of Trade Names and Trademarks.  Except as authorized by Section 9.1(a), Seller agrees to remove or cease to use, within one week of the Closing Date, any and all of the Trademarks which appear: (i) on all showrooms wherever located; (ii) in Seller's retail store located in Vacaville, California; and (iii) on all letterhead, business cards, billing statements, invoices and all other documents of any nature (except for stock certificates outstanding as of the Closing Date).  Seller further agrees to remove on or before December 31, 1996, any and all of the Trademarks which appear in Seller's retail store located in the Beverly Center shopping center in Los Angeles, California (the "Beverly Center Store").  Seller also agrees to refrain from answering telephones with the name of any of the Trademarks or otherwise holding itself out as in any way associated with the Trademarks.



9.12    Seller's Sales Representatives and Employees.  Buyer and Seller agree that from the date hereof, Buyer shall have the right to communicate with and solicit Seller's sales representatives and Seller's employees to discuss the possibility of such persons being employed by or representing Buyer.

9.13    Reimbursement for Sales Commissions.  Buyer agrees to reimburse Seller, at the Closing, an aggregate amount of $35,000 for sales commissions Seller has paid to its independent sales representatives during the month of June 1996.

9.14    Survival of Representations and Warranties.  Buyer, Seller and the Shareholders agree that the respective representations and warranties contained in this Agreement shall terminate on the second anniversary of the Closing Date.

10.    Covenants.

10.1    Shareholder Meeting and Board Recommendation.  Seller shall schedule a meeting of its shareholders to be held no later than August 30, 1996, for the purpose of approving the transactions contemplated by this Agreement (the "Transactions"), and Seller's Board of Directors shall file with the Securities and Exchange Commission (the "SEC"), and shall solicit proxies through, a proxy statement, a preliminary filing of which shall be filed with the SEC on or before July 19, 1996, and which shall be mailed to Seller's shareholders as soon as possible after completion of SEC review and Seller's responses thereto, if any, of the preliminary proxy statement, and which proxy statement shall recommend to Seller's shareholders approval of the Transactions.

10.2    Maintenance of Business.  During the period from the date hereof to the Closing Date, Seller will carry on its business in the ordinary course and in substantially the same manner as it has prior to the date of this Agreement and agrees not to enter into any material agreements with respect to the Trademarks or take any other significant actions with respect to the Trademarks without the prior written consent of Buyer.

10.3    Other Discussions.  From and after the date of this Agreement until the Closing or this Agreement is terminated in accordance with its terms, neither Seller nor any of its officers, directors, agents or representatives (including the Shareholders) will initiate discussions, solicit or negotiate (including providing any non-public information concerning its business), or authorize any person or entity to discuss, solicit or negotiate on its or their behalf, with any other party concerning the possible sale or disposition of all or substantially all of Seller's business, assets or capital stock or the Trademarks.  Seller will immediately notify Buyer, however, if any offer is received from a potential purchaser or of any discussions with a potential purchaser regarding the Trademarks or the capital stock of Seller or any of its assets outside the ordinary course.

10.4    Best Efforts.  Each party will use its reasonable best efforts to cause all conditions to the Closing to be satisfied as soon as practicable.  Each party shall use its reasonable best efforts to obtain any consents necessary or desirable in connection with the consummation of

the transactions contemplated by this Agreement, and in particular Seller shall use all reasonable efforts to obtain the consent of Bank of New York.

10.5    Shareholder Vote. Each of the Shareholders, individually and in all other capacities, as Trustee or otherwise, agrees to vote all of the shares of capital stock of Seller held of record or beneficially by them in favor of the Transactions. Seller will provide to all holders of its capital stock entitled to vote upon or consent to the Transactions such information as is necessary to satisfy all requirements of applicable federal and state securities laws and California corporate law in connection with the submission of the Transactions to such shareholders for their approval. This Section 10.5 shall constitute the written instructions by each of the Shareholders to each of the other Shareholders to vote their respective shares of capital stock of Seller in favor of the Transactions as required or contemplated by any agreements by and among or between the Shareholders.

10.6    Additional Share Issuances. Seller agrees that it shall not issue any capital stock or securities convertible into capital stock ("Seller's Securities") between the date hereof and the Closing Date if the issuance of such Seller's Securities would cause the aggregate number of shares of capital stock of Seller held by the Shareholders (without including the affirmative vote of shares of Seller's capital stock not held by the Shareholders (other than those shareholders of Seller referred to in Section 10.9 below)) to represent less than the requisite number of voting securities of Seller required to approve the Transactions under applicable law at the shareholder meeting referred to in Section 10.1 above.

10.7    Transfer of Shares by Shareholders. Each of the Shareholders individually and in all other capacities, as trustee or otherwise, agrees that he or she will not sell or otherwise transfer any of the shares of Seller's capital stock held by him or her between the date hereof and the Closing Date unless the purchaser or transferee of such shares agrees in writing, in a form reasonably satisfactory to Buyer and its counsel, to vote all of such shares of capital stock of Seller in favor of the Transactions at the shareholder meeting referred to in Section 10.1 above.

10.8    Access to Information. Buyer will have reasonable access to the facilities, employees and records of Seller; provided, however, in no event shall such access be permitted to interfere with the day to day operations of Seller.

10.9    Agreement to Vote Shares by Shareholders Receiving Seller's Stock in Exchange for Debt of Seller. Seller agrees to provide to Buyer, no later than July 9, 1996, in a form reasonably satisfactory to Buyer and Buyer's counsel, a written agreement from those holders of Seller's capital stock whose shares are necessary, when aggregated with the Shareholders' shares, to constitute the requisite number of voting securities of Seller required to approve the Transactions under applicable law, to the effect that such holders will vote in favor of and will approve the Transactions at the shareholder meeting referred to in Section 10.1 above. It is contemplated that the agreement referred to in the previous sentence will be executed and delivered by persons who have recently or will become shareholders of Seller by virtue of their exchanging debt obligations owed to them by Seller for Seller's common stock.

11.    <u>Conditions to Closing.</u>

11.1    The obligations of Buyer and Seller to consummate the transactions contemplated hereby shall be subject to the fulfillment, at or prior to the Closing, of all of the following conditions:

(a)    <u>No Action or Proceeding.</u>  No claim, action, suit, investigation or other proceeding shall be pending or threatened before any court or governmental agency which presents a substantial risk of the restraint or prohibition of the Transactions or the obtaining of material damages or other relief in connection therewith.

(b)    <u>Compliance with Law.</u>  There shall have been obtained all permits, approvals and consents of all governmental bodies or agencies which counsel for Buyer or for Seller may reasonably deem necessary or appropriate so that consummation of the Transactions will be in compliance with applicable laws.

11.2    The obligations of Buyer to consummate the transactions contemplated hereby shall be subject to the fulfillment, at or prior to Closing, of all of the following conditions (any one or more of which conditions may be waived within the sole and absolute discretion of Buyer, provided, however, that no such waiver of any condition constitutes a waiver by Buyer of any of its other rights or remedies, at law or equity, in the event Seller or any of the Shareholders breaches this Agreement):

(a)    <u>Bank of New York Consent.</u>  The consent of Bank of New York shall have been obtained in written instruments reasonably satisfactory to Buyer.

(b)    <u>Removal of Liens Filed or Recorded Against Seller.</u>  Any and all documents recorded or filed against Seller or the Trademarks pursuant to the terms of the documents of Bank of New York reflecting Seller as debtor or reflecting Liens placed on or against the Trademarks shall be terminated or modified to delete any reference to Seller or the Trademarks, effective as of the Closing Date.

(c)    <u>Secretary's Certificate.</u>  Buyer shall have received from the Secretary of Seller a certificate, dated the Closing Date, to the effect that resolutions of Seller's Board of Directors authorizing the Transactions have been duly and validly adopted and remain in full force, and certifying as to the incumbency of the officer of Seller executing this Agreement.

(d)    <u>Shareholder Approval.</u>  Seller shall have received the valid approval by Seller's shareholders of the Transactions.

(e)    <u>Board of Directors Approval.</u>  Buyer's Board of Directors shall have approved the Transactions.



(f)    Change in Names.  Seller shall have prepared and delivered to Buyer for filing with the appropriate governmental or other authorities the necessary documents and instruments with instructions permitting Buyer to file such documents and instruments in order to change the names of the following corporations or entities: Sam & Libby, Inc., Sam & Libby (HK) Limited, Sam & Libby Brazil and Sam & Libby Outlets, Inc. such that the new names of such corporations or entities shall not resemble the current names or contain in any way any of the Trademarks as listed in Exhibit A to this Agreement.

(g)    Agreements Not to Compete.  Each of Samuel L. Edelman and Louise B. Edelman shall have entered into non-compete agreements, substantially in the form of Exhibit E to this Agreement (each a "Non-Compete Agreement"), with Buyer, which agreements shall provide, among other things, that each of Samuel L. Edelman and Louise B. Edelman's ability to participate actively in the branded footwear business from the date hereof through December 31, 1996 shall be restricted to certain conditions enumerated therein.

(h)    Opinion of Seller's Trademark Counsel.  Buyer shall receive at the Closing an opinion of Peter M. Eichler of the law firm Troop Meisinger Steuber & Pasich, LLP, special trademark counsel to Seller, that Seller owns all right, title and interest in and to the Trademarks as described in Exhibit A to this Agreement, that such counsel is not aware of any claim to the contrary or any challenge by any person or entity to the rights of Seller with respect to the foregoing and that upon consummation of the Transactions Buyer shall own and be vested with all right, title and interest in and to the Trademarks, free and clear of all Liens.

(i)    Opinion of Seller's Counsel.  Buyer shall receive at the Closing:

(x)    an opinion of Wilson, Sonsini, Goodrich & Rosati, corporate counsel to Seller, in form and substance satisfactory to counsel for Buyer, to the effect that: (A) Seller is a corporation duly incorporated and validly existing in good standing under the laws of the State of California; (B) Seller has the requisite corporate power and authority to enter into and carry out the Transactions; (C) the execution and delivery by Seller of this Agreement, and the performance by Seller of its obligations under this Agreement, have been duly authorized by all necessary corporate action on the part of Seller; and (D) the execution, delivery or performance of this Agreement by Seller will not (1) conflict with or violate the Articles of Incorporation or the Bylaws of Seller; (2) conflict with, result in a material breach of or a material default under any material agreements of Seller known to such counsel; or (3) violate or contravene any United States federal or California state law, statute, rule or regulation applicable to Seller or result in or require the creation or imposition of any lien on any properties or revenues of Seller; and

(y) an opinion of Kaufmann, Feiner, Yamin, Gildin & Robbins LLP, counsel to Seller, in form and substance satisfactory to counsel for Buyer, to the effect that: (A) this Agreement constitutes a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, arrangement, fraudulent conveyance, moratorium or other laws relating to or affecting the rights of creditors generally or by general principles of equity, whether considered in a proceeding in equity or at law; and (B) the execution, delivery or performance of this Agreement by Seller will not: (1) conflict with, result in a material breach of or a material default under any material agreements of Seller known to such counsel; or (2) violate or contravene any United States federal or New York state law, statute, rule or regulation applicable to Seller or result in or require the creation or imposition of any lien on any properties or revenues of Seller.

(j)    <u>Representations and Warranties of Seller True</u>.  Each of the representations and warranties of Seller contained in this Agreement or in any document delivered pursuant hereto shall be true and correct in all material respects on the Closing Date with the same effect as if made on the Closing Date.

(k)    <u>Representation and Warranty of Shareholders True</u>.  The representation and warranty of each of the Shareholders contained in Section 7.1 shall be true and correct in all material respects on the Closing Date with the same effect as if made on the Closing Date.

(l)    <u>Delivery of Trademark Assignments</u>.  Seller shall have delivered to Buyer in recordable form assignments of the Trademarks, which assignments shall have been executed and acknowledged by Seller, as well as any and all other documents and instruments reasonably necessary to transfer title and interest in and to the Trademarks, free and clear of all Liens, to Buyer and to consummate the transactions contemplated herein.

(m)    <u>Agreement to Vote Shares</u>.  Buyer shall have received, no later than July 9, 1996, the agreements required by Section 10.9 above.

11.3    The obligations of Seller to consummate the transactions contemplated hereby shall be subject to the fulfillment, at or prior to Closing, of all of the following conditions (any one or more of which conditions may be waived within the sole and absolute discretion of Seller, provided, however, that no such waiver of any condition constitutes a waiver by Seller of any of its other rights or remedies, at law or equity, in the event Buyer breaches this Agreement):

(a)    <u>Representations and Warranties True</u>.  Each of the representations and warranties of Buyer contained in this Agreement or in any document delivered



pursuant hereto shall be true and correct in all material respects on the Closing Date with the same effect as if made on the Closing Date.

12.    Indemnification.  For purposes of this Section 12, "Affiliate" of a party shall mean a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such party.

### 12.1    Indemnification by Seller.

(a)    Seller shall, for a period of two years from and including the date hereof, indemnify and hold harmless Buyer and each of its Affiliates, directors, officers, employees, attorneys, agents and representatives (collectively, the "Affiliated Parties") in respect of any and all claims, losses, damages, liabilities, declines in value, penalties, interest, costs and expenses (including, without limitation, any attorneys', accountants' and consultants' reasonable fees and other expenses) reasonably incurred by Buyer or its respective Affiliated Parties, together with interest on cash disbursements in connection therewith, at an annual rate equal to the prime rate as reported by the Bank of Boston (the "Prime Rate") then in effect, from the date such cash disbursements were made by Buyer or any of its Affiliated Parties until paid by Seller, in connection with each and all of the following:

(i)    Any breach of any representation or warranty made by Seller in this Agreement or pursuant hereto, which relates to, is associated with or arises from any matter related to those Trademarks relating to footwear or apparel (the "Footwear and Apparel Trademarks");

(ii)    Any misrepresentation contained in any written statement or certificate furnished by Seller pursuant to this Agreement, which relates to, is associated with or arises from any matter related to the Footwear and Apparel Trademarks; or

(iii)    Any breach of any covenant, agreement or obligation of Seller contained in this Agreement or any other instrument delivered in connection with this Agreement, which relates to, is associated with or arises from any matter related to the Footwear and Apparel Trademarks.

(b)    Seller shall, for a period of two years from and including the date hereof, indemnify and hold harmless Buyer and each of its Affiliates, directors, officers, employees, attorneys, agents and representatives (collectively, the "Affiliated Parties") in respect of any and all costs and expenses actually expended (including, without limitation, any reasonable attorneys' fees and such other reasonable and necessary costs and expenses), excluding any and all incidental and/or consequential damages of any nature, together with interest on cash disbursements in connection therewith, at an annual rate equal to the Prime Rate then in effect, from the date such cash disbursements were made by Buyer or any of its Affiliated Parties until paid by Seller, incurred by Buyer or its respective Affiliated Parties, arising out of all claims, losses, damages, liabilities, penalties and interest, excluding any and all incidental and/or consequential damages of any nature, in connection with each and all of the following (except to the extent covered by Section 12.1(a) above):

(i)    Any breach of any representation or warranty made by Seller in this Agreement or pursuant hereto;

(ii)    Any misrepresentation contained in any written statement or certificate furnished by Seller pursuant to this Agreement; or

(iii)    Any breach of any covenant, agreement or obligation of Seller contained in this Agreement or any other instrument delivered in connection with this Agreement.

(c)    No claim, demand, suit or cause of action shall be brought against Seller under this Section 12.1 unless and until the aggregate amount of claims against Seller under this Agreement exceeds $50,000, in which event Buyer shall be entitled to indemnification from Seller for all claims hereunder relating back to the first dollar, provided further, however, that Seller's liability shall in no event exceed the Purchase Price.

(d)    As used in this Section 12.1, any reference to Trademarks relating to apparel shall only mean junior sportswear apparel as previously marketed by Seller.

12.2    Indemnification by Shareholders.  Each Shareholder shall, for a period of two years from and including the date hereof, indemnify and hold harmless Buyer and each of its Affiliates, directors, officers, employees, attorneys, agents and representatives (collectively, the "Affiliated Parties") in respect of any and all costs and expenses actually expended (including, without limitation, any reasonable attorneys' fees and such other reasonable and necessary costs and expenses), excluding any and all incidental and/or consequential damages of any nature, together with interest on cash disbursements in connection therewith, at an annual rate equal to the Prime Rate then in effect, from the date that such cash disbursements were made by Buyer or any of its Affiliated Parties, until paid by such Shareholder, incurred by Buyer or its respective Affiliated Parties, arising out of all claims, losses, damages, liabilities, penalties and interest, excluding any and all incidental and/or consequential damages of any nature, in connection with each and all of the following:

(a)    Any breach of Section 7.1 of this Agreement by such Shareholder;

(b)    Any breach of Sections 9.6 (in his or her individual capacity), 10.3 (in his or her individual capacity), 10.5 or 10.7 of this Agreement by such Shareholder; or

(c)    As to Samuel L. Edelman and Louise B. Edelman only, any breach of Section 9.10 of this Agreement.

No claim, demand, suit or cause of action shall be brought against such Shareholder under this Section 12.2 unless and until the aggregate amount of claims against all Shareholders under this Agreement and the Non-Compete Agreements exceeds $50,000, in which event Buyer shall be entitled to indemnification from such Shareholder for all claims hereunder relating back to the first dollar, provided, however, that the Shareholders' aggregate liability with respect to breaches of Sections 7.1, 9.10, 10.5 and 10.7 shall in no event exceed the Purchase Price, and provided, further, the Shareholders' aggregate liability with respect to breaches of Sections 9.6 and 10.3 shall in no event exceed $1,000,000.

12.3   Indemnification by Buyer. Buyer shall, for a period of two years from and including the date hereof, indemnify and hold harmless Seller and each of its Affiliates, directors, officers, employees, attorneys, agents and representatives (collectively, the "Affiliated Parties") in respect of any and all costs and expenses actually expended (including, without limitation, any reasonable attorneys' fees and such other reasonable and necessary costs and expenses), excluding any and all incidental and/or consequential damages of any nature, together with interest on cash disbursements in connection therewith, at an annual rate equal to the Prime Rate then in effect, from the date that such cash disbursements were made by Seller or any of its Affiliated Parties, until paid by Buyer, incurred by Seller or its respective Affiliated Parties, arising out of all claims, losses, damages, liabilities, penalties and interest, excluding any and all incidental and/or consequential damages of any nature, in connection with each and all of the following:

(a)   Any breach of any representation or warranty made by Buyer in this Agreement or pursuant hereto;

(b)   Any breach of any covenant, agreement or obligation of Buyer contained in this Agreement or any other instrument contemplated by this Agreement; or

(c)   Any misrepresentation contained in any statement or certificate furnished by Buyer pursuant to this Agreement or in connection with the Transactions.

No claim, demand, suit or cause of action shall be brought against Buyer under this Section 12.3 unless and until the aggregate amount of claims against Buyer under this Agreement exceeds $50,000, in which event Seller shall be entitled to indemnification from Buyer for all claims hereunder relating back to the first dollar, provided further, however, that Buyer's liability shall in no event exceed the Purchase Price.

12.4   Maximum Damages. Buyer, Shareholders and Seller agree that:

(a)   Subject to the provisions of Section 12.2 with respect to lower maximum amounts of damages, damages in the aggregate to be paid by Seller and/or any one or more Shareholders in any capacity, as the case may be, to Buyer under Sections 12.1 and/or 12.2 hereof and under Section 2 of the Non-Compete Agreement shall in no event exceed Five Million Five Hundred Thousand Dollars ($5,500,000) for any and all claims under this Agreement of any and all natures, so that the maximum amount which shall be paid to Buyer from Seller and all Shareholders under Sections 12.1 and 12.2 in any capacity and pursuant to this Agreement and all Non-Compete Agreements shall not exceed Five Million Five Hundred Thousand Dollars ($5,500,000).

(b)   Any sums paid to Buyer under the provisions of Section 2 of the Non-Compete Agreement shall be applied to reduce the maximum amount of liability of Seller and/or any one or more Shareholders in any capacity, as the case may be, under Sections 12.1 and/or 12.2 hereof, as the case may be;

(c)   Any sums paid by Seller and/or any one or more Shareholders in any capacity, as the case may be, to Buyer under Section 12.1 and/or 12.2 of this Agreement shall be applied to reduce the maximum liability under Section 2 of the Non-Compete Agreement; and





(d)    Damages to be paid by Buyer to Seller under Section 12.3 hereof shall, in the aggregate, in no event exceed Five Million Five Hundred Thousand Dollars ($5,500,000) for any and all claims under this Agreement of any and all natures.

13.    Miscellaneous.

13.1    Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed given on the next business day if delivered personally or by telecopier (with a confirming copy sent via Federal Express or other international courier) to the parties, their successors in interest or their assignees at the following addresses, or at such other addresses as the parties may designate by written notice in the manner aforesaid:

|  |  |
|---|---|
| If to Buyer: | Maxwell Shoe Company Inc.<br>101 Sprague Street<br>Hyde Park (Boston), Massachusetts 02136<br>Attention: Mark J. Cocozza, President<br>Facsimile: (617) 364-9058<br>Telephone: (617) 333-4028 |
| With a concurrent copy to: | Gibson, Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, California  90071<br>Attention: Jonathan K. Layne, Esq.<br>Facsimile: (213) 229-7520<br>Telephone: (213) 229-7141 |
| If to Seller: | Sam & Libby, Inc.<br>58 West 40th Street<br>New York, New York 10018<br>Attention: Kenneth Sitomer,<br>Chief Operating Officer and Chief Financial Officer<br>Facsimile: (212) 944-4837<br>Telephone: (212) 782-4830 |



With a concurrent copy to:    Kaufmann, Feiner, Yamin, Gildin & Robbins LLP
777 3rd Avenue, 24th Floor
New York, New York 10017
Attention: Michael Yamin, Esq.
Facsimile: (212) 755-3174
Telephone: (212) 755-3100

and

Wilson, Sonsini, Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304
Attention: Steven L. Berson, Esq.
Facsimile: (415) 493-6811
Telephone: (415) 493-9300

If to Shareholders:    Sam Edelman
212 Mount Holly Road
Katonah, New York 10536
Facsimile: (914) 232-7901
Telephone: (914) 232-6690

With a concurrent copy to:    Kaufmann, Feiner, Yamin, Gildin & Robbins LLP
777 3rd Avenue, 24th Floor
New York, New York 10017
Attention: Michael Yamin, Esq.
Facsimile: (212) 755-3174
Telephone: (212) 755-3100

and

Wilson, Sonsini, Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304
Attention: Steven L. Berson, Esq.
Facsimile: (415) 493-6811
Telephone: (415) 493-9300

13.2   Assignability and Parties in Interest.

(a)    This Agreement shall not be assignable by either Buyer or Seller except that Buyer may assign its rights hereunder to, and have its obligations hereunder assumed by, a wholly-owned subsidiary of Buyer without releasing Buyer. This Agreement shall inure to the benefit of and be binding upon Buyer and Seller and their respective permitted successors and assigns.

(b)    This Agreement shall inure to the benefit of and be binding upon each of the Shareholders and their respective permitted successors and assigns.

13.3    Counterparts; Fax.  This Agreement may be executed by fax and simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute but one and the same instrument.

13.4    Financing.  The transactions contemplated by this Agreement are not subject to any financing contingency on the part of Buyer.

13.5    Certain Taxes.  Except for those costs specifically noted in Section 9.8, all sales, value added, use, transfer, registration, stamp and similar taxes imposed in connection with the sale of the Trademarks shall be borne by Seller.

13.6    Complete Agreement.  This Agreement, together with all Schedules and Exhibits A, B, C, D and E hereto, and any documents delivered or to be delivered pursuant to this Agreement contain or will contain the entire agreement among the parties hereto with respect to the transactions contemplated herein and shall supersede all previous oral and written and all contemporaneous oral negotiations, commitments and understandings.

13.7    Modifications, Amendments and Waivers.  None of the terms or provisions of this Agreement may be modified, amended or waived, except by a written instrument executed by the parties.

13.8    Interpretation.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

13.9    Severability.  Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions hereof in such jurisdiction or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

13.10    Expenses.  Buyer, on the one hand, and Seller and the Shareholders, on the other hand, will pay their own costs and expenses related to the negotiation, preparation and execution of this Agreement and the transactions contemplated thereby, including, but not limited to, any fairness opinion Seller may receive in connection with the Transactions.

13.11    Termination by Mutual Consent.  At any time prior to the Closing, this Agreement may be terminated by the mutual written consent of the parties.

13.12    Injunctive Relief.

(a)    The parties acknowledge and agree that monetary damages are inadequate and insufficient to fully recompense Buyer for any breaches of this Agreement by Seller or the Shareholders, and therefore, the parties stipulate that Buyer shall be entitled to injunctive relief, specific performance and/or any other appropriate remedy for any breaches by Seller or the



Shareholders of this Agreement, including, but not limited to, breaches of Sections 9.1, 9.2, 9.5, 9.10, 9.11 and 10.5 of this Agreement.

(b)    The parties acknowledge and agree that monetary damages are inadequate and insufficient to fully recompense Seller for a breach of Sections 9.1(a) and/or 9.10 of this Agreement by Buyer, and therefore, Buyer and Seller stipulate that Seller shall be entitled to injunctive relief, specific performance and/or any other appropriate remedy for a breach by Buyer of Sections 9.1(a) and/or 9.10 of this Agreement.

13.13    Governing Law. This Agreement shall be governed by, and construed and enforced in accordance with, the internal law, and not the law pertaining to conflicts or choice of law, of the State of New York.

13.14    Arbitration. Any controversy, dispute or claim based upon, arising out of, in connection with, or in relation to, the Transactions, or based upon any interpretation of, this Agreement, shall be settled, at the written request of any party, by final and binding arbitration conducted in the city of New York, New York. The arbitration shall be conducted by JAMS/Endispute, in accordance with its then existing rules for commercial arbitration. Judgment upon any award rendered by the arbitrator shall be final and binding with no rights of appeal and may be entered by any State or Federal court having jurisdiction thereof. The parties further intend that this arbitration provision shall have the effect of a waiver by all parties to a jury trial. The arbitration shall be conducted by a single arbitrator. The arbitrator shall be chosen by mutual consent of the parties from a list of available arbitrators provided by JAMS/Endispute within ten (10) days of receipt of the list. If the parties cannot reasonably agree upon an arbitrator within the ten (10) day period, each party shall select within ten (10) days an arbitrator from the list provided by JAMS/Endispute. The two arbitrators selected will then select a third arbitrator within fifteen (15) days, who will become the sole arbitrator for such controversy, dispute or claim. The arbitrator shall have the power to award Buyer injunctive relief against Seller or any of the Shareholders, pursuant to Section 13.12 of this Agreement or otherwise, in the event this Agreement is breached by any such entity or person. The arbitrator shall award to the prevailing party with respect to any matter submitted to arbitration hereunder all reasonable attorneys fees, all expert fees and expenses and all costs as may be incurred in connection with either obtaining or collecting any judgment and/or arbitration award, in addition to any other relief to which that party may be entitled.

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement as of the date first above written.

**BUYER**

**MAXWELL SHOE COMPANY INC.**, a Delaware corporation

By: _Mark J. Cocozza_

Name:  Mark J. Cocozza
Title:  President and Chief Operating Officer


**SELLER**

**SAM & LIBBY, INC.**, a California corporation


By: _____

Name:    Kenneth Sitomer
Title:    Chief Operating Officer and
          Chief Financial Officer

**THE SHAREHOLDERS:**


_____

Samuel L. Edelman, individually and as trustee, if applicable (as to Sections 7.1, 9.6, 9.10, 9.14, 10.3, 10.5, 10.7, 11.2(g), 11.2(k), 12.2, 12.4, 13.2(b), 13.10, 13.12(a) and 13.14 of this Agreement)

(5,102,822 Shares held as community property with Louise B. Edelman)


_____

Louise B. Edelman, individually and as trustee, if applicable (as to Sections 7.1, 9.6, 9.10, 9.14, 10.3, 10.5, 10.7, 11.2(g), 11.2(k), 12.2, 12.4, 13.2(b), 13.10, 13.12(a) and 13.14 of this Agreement)

(5,102,822 Shares held as community property with Samuel L. Edelman)

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement as of the date first above written.

**BUYER**
MAXWELL SHOE COMPANY INC., a
Delaware corporation

By:_____
Name:  Mark J. Cocozza
Title:  President and Chief Operating Officer

**SELLER**
SAM & LIBBY, INC., a California corporation

By:_____
Name:    Kenneth Sitomer
Title:    Chief Operating Officer and
          Chief Financial Officer

**THE SHAREHOLDERS:**

_____
Samuel L. Edelman, individually and as trustee, if
applicable (as to Sections 7.1, 9.6, 9.10, 9.14, 10.3,
10.5, 10.7, 11.2(g), 11.2(k), 12.2, 12.4, 13.2(b),
13.10, 13.12(a) and 13.14 of this Agreement)

(5,102,822 Shares held as community property with
Louise B. Edelman)

_____
Louise B. Edelman, individually and as trustee, if
applicable (as to Sections 7.1, 9.6, 9.10, 9.14, 10.3,
10.5, 10.7, 11.2(g), 11.2(k), 12.2, 12.4, 13.2(b),
13.10, 13.12(a) and 13.14 of this Agreement)

(5,102,822 Shares held as community property with
Samuel L. Edelman)

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement as of the date first above written.

**BUYER**
**MAXWELL SHOE COMPANY INC.**, a Delaware corporation

By:_____
Name:  Mark J. Cocozza
Title:  President and Chief Operating Officer

**SELLER**
**SAM & LIBBY, INC.**, a California corporation

By:_____
Name:    Kenneth Sitomer
Title:    Chief Operating Officer and
            Chief Financial Officer

**THE SHAREHOLDERS:**

_____
Samuel L. Edelman, individually and as trustee, if applicable (as to Sections 7.1, 9.6, 9.10, 9.14, 10.3, 10.5, 10.7, 11.2(g), 11.2(k), 12.2, 12.4, 13.2(b), 13.10, 13.12(a) and 13.14 of this Agreement)

(5,102,822 Shares held as community property with Louise B. Edelman)

_____
Louise B. Edelman, individually and as trustee, if applicable (as to Sections 7.1, 9.6, 9.10, 9.14, 10.3, 10.5, 10.7, 11.2(g), 11.2(k), 12.2, 12.4, 13.2(b), 13.10, 13.12(a) and 13.14 of this Agreement)

(5,102,822 Shares held as community property with Samuel L. Edelman)

LA961320.12 1/26+

Stuart L. Kreisler Individually (as to Sections 7.1,
9.6, 9.14, 10.3, 10.5, 10.7, 11.2(k), 12.2, 12.4,
13.2(b), 13.10, 13.12(a) and 13.14 of this
Agreement)

(1,158,000 Shares)

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing DECLARATION OF KENNETH SITOMER, was served by hand, this 14th day of May, 2004, upon counsel for the Plaintiff:

> Michael A. Albert, Esq.
> WOLF, GREENFIELD & SACKS, P.C.
> 600 Atlantic Avenue
> Boston, Massachusetts 02210

Christopher Centurelli

NY-301879 v1 0821198-0002