IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAXWELL SHOE COMPANY, INC., <br><br> Plaintiff, <br><br> v. <br><br> EDELMAN SHOE COMPANY, LLC and SAM EDELMAN, <br><br> Defendants. | Civil Action No. 04-10694 RCL |

**PLAINTIFF'S REPLY IN SUPPORT OF**
**<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

Maxwell Shoe Co., Inc. ("Maxwell") respectfully submits this reply memorandum in support of its motion for preliminary injunction against Edelman Shoe Co., LLC and Sam Edelman (collectively "Edelman"). Edelman's Opposition misrepresents trademark law concerning personal names, mischaracterizes the purchase and sale agreement between the parties (the "Agreement") and misstates underlying facts such as the similarity of the products at issue and Maxwell's attempts to halt Edelman's infringement. Maxwell submits this memorandum to address these errors.

Sam Edelman originally created the trademark SAM & LIBBY® ("the Mark") by combining his name with his wife's name. After using the Mark for five years, Edelman sold all rights in the Mark to Maxwell for $5.5 million. When Edelman first re-entered the footwear business a few years later, he did so under another trademark, NAKED FEET. That business failed. Edelman evidently concluded that, to succeed in the shoe business, he would need to cash in on the goodwill of the Mark he sold to Maxwell. But he already cashed in that chip once

before. It is no longer his. His current usage infringes Maxwell's rights in the Mark, and should be enjoined.

Edelman's argument to the contrary relies on a lengthy chain of inaccurate assertions. Ignoring the eight-factor test for likelihood of confusion set forth by the First Circuit and analyzed in Maxwell's opening brief, he instead takes issue with a couple of items on that list – those he thinks he has at least some argument on. Yet even there, his claims miss the mark. For example, while he can hardly deny that his goods and Maxwell's are closely related – indeed virtually identical (women's dress shoes) – he incorrectly asserts that his products and Maxwell's are not at the same price point. As discussed below, they plainly are. Likewise, he falsely claims that Maxwell made no effort to contact him before this case began. But in fact, Maxwell did just that, and Edelman evaded service of a cease-and-desist letter on him. Even if he were right on both points, however, the overwhelming weight of the eight-factor test still suggests a likelihood of confusion.

His statements about the law are as error-ridden as his characterizations of the facts. For example, he mischaracterizes the holdings of cases such as Taylor, which according to him denied an injunction but which in fact allowed one. Perhaps most importantly, he confuses the use of a name with the use of a trademark. Inviting the Court to commit a classic error of trademark law, Edelman suggests that because he was precluded by the agreement from using his name for only a limited period of time, he must be entitled thereafter to use his name in any way he wants; and the way he wants to use it is to turn a portion of it into a trademark to sell a virtually identical class of goods, despite the confusing similarity of his mark to Maxwell's. As discussed below, there is on-point authority that is directly to the contrary. Just because Edelman may have the right to use his name does not give him license to commit trademark

infringement with it, any more than a contract authorizing him to use a car would entitle him to drive it across someone's private property.

Indeed, carrying Edelman's theory to its logical conclusion, since his first name is "Sam" and his wife's first name is "Libby," nothing in the agreement would bar them from using the mark "Sam & Libby" – the identical mark to the one he sold Maxwell, on a line of similarly-priced and similarly-marketed footwear. The reason why this result is wrong – and why his entire argument is wrong – is that nothing in the Agreement allows him to use his name as a <u>trademark</u>, if and to the extent that doing so would infringe on the valuable trademark rights he sold Maxwell.

## I. EDELMAN HAS NO RIGHTS TO USE THE INFRINGING MARKS.

The parties agree that Maxwell paid $5.5 million for the SAM & LIBBY® line of trademarks and its goodwill. The parties also agree that as part of that Agreement, Edelman agreed to not use his name <u>at all</u> in the footwear industry until July 26, 1999. Where the parties disagree, however, is over the extent to which Edelman is permitted to use his name after that date. Edelman contends that he is free to use the name in any manner he sees fit, whereas Maxwell contends that Edelman's use of his name must still stay within the bounds of trademark law and cannot infringe on Maxwell's trademark rights. As shown below, neither the trademark law, nor the Agreement between the parties, allow for Edelman to use his name in a manner which infringes Maxwell's trademark rights.

### A. <u>Edelman's Name Cannot Be Used In An Infringing Manner.</u>

Edelman does not have the right to use his personal name in a manner that infringes Maxwell's trademark. "[P]ersons with names that are the same as strong and famous personal

name trademarks have no 'right' to confuse the public by engaging in certain businesses under their name." 2 McCarthy on Trademarks and Unfair Competition § 13:8 (4th Ed. 2004). "[T]he old notion that an individual has an absolute right to use her surname when someone else has adopted the name first and established secondary meaning is dead." R.J. Toomey Co. v. Toomey, 683 F. Supp. 873, 879 (D. Mass. 1988) (citing cases) (enjoining junior user's use of his name as a trademark); A.V. by Versace, Inc. v. Gianni Versace, S.p.A., 2002 WL 2012618 at *12 (S.D. N.Y. 2002) ("Modern jurisprudence has evolved such that there is no inherent right to use one's own name as a trademark") (barring junior user from any use of VERSACE name). The fact that Mr. Edelman's name is "Sam Edelman" does not give him unfettered right to use that name as a source identifier of goods closely related to Maxwell's if that name infringes the trademark rights of another, namely Maxwell.

Contrary to Edelman's assertions, there is a difference between someone using his/her name as a trademark and simply using the name to take legitimate credit for his or her designs. See Gucci v. Gucci Shops, 688 F. Supp. 916 (S.D. N.Y. 1988) (enjoining junior user's use of his name as a trademark). The facts here are analogous to those in Gucci. There Paolo Gucci, grandson of the famous leather goods manufacturer, separated from his grandfather's company. He was enjoined from using his name as a trademark, but was permitted to use his full name to identify himself as the designer of products marketed under a different mark and accompanied by a disclaimer that he was not associated with the senior mark. This distinction between use of a name as simply a name rather than a trademark is one made by many courts and is directly relevant here. See Basile, S.p.A. v. Basile, 899 F.2d 35, 39 (D.C. Cir. 1990) (junior user of personal name mark enjoined from causing confusion with senior user); Joseph Scott Co. v. Scott

Swimming Pools, Inc., 764 F.2d 62 (2d Cir. 1985) (junior user of personal name mark enjoined from causing confusion with senior user).

Edelman apparently understood this obligation as of the time of his last foray into the shoe industry. According to Edelman's own papers, he used the trademark NAKED FEET, to which he appended the words "by Sam Edelman." The trademark NAKED FEET does not infringe Maxwell's SAM & LIBBY® Mark. Unfortunately for Edelman, the NAKED FEET shoe line was unsuccessful. Had Edelman chose to re-launch his new line under the mark NAKED FEET, or some other non-infringing mark, Maxwell would have had no objection. Instead of choosing that, or another, trademark and building up his own goodwill, Edelman opted for marks which latched onto the goodwill he had sold to Maxwell, and created confusion as to source, sponsorship, or affiliation with that company. Edelman chose SAMMY E and SAM EDELMAN,[1] marks which were either Edelman's name or variations thereof (just like SAM & LIBBY®). Edelman evidently hopes these marks will have more value in the shoe industry. And indeed, he is right – they do have considerable value, which is why Maxwell paid so much money for the Mark. Unsuccessful in his effort to buy the Mark back,[2] Edelman must build up his own goodwill in his own mark.

As the Gucci and Toomey courts detail, this use of Edelman's name is improper: it infringes Maxwell's Mark.

---

[1] In his Opposition Edelman stated for the first time that he has abandoned the mark SAM BY SAM EDELMAN and is instead using the mark SAM EDELMAN. Edelman's use of this mark is infringing for the same reasons described in Maxwell's initial brief with regard to SAM BY SAM EDELMAN. Both versions of the mark have the same problem – their dominant portion is the word "SAM," which is also the dominant portion of Maxwell's mark. Considering the marks are used for the same types of goods, confusion is likely.

[2] Edelman admits having contacted Maxwell in an effort to buy back the SAM & LIBBY mark right around the time that he was developing his new line of shoes. He claims, however, that he did so for a purpose unrelated to his new line of shoes. In assessing likelihood of success, the Court can certainly assess the plausibility of his claim that this was a mere innocent coincidence. And even if it were, it certainly makes clear his awareness that he no longer owned this Mark or any rights to it.

Edelman takes Maxwell to task for citing Taylor Wine Co. v. Bully Hill Vineyards, Inc., 569 F.2d 731 (2nd Cir. 1978). Edelman erroneously claims that, in Taylor, "the court[] refused to enjoin defendants' use of their names." (Def. Br. at 12). Edelman's characterization of that holding is simply wrong. The Taylor court expressly held: "We do not doubt the necessity for an injunction in this case." 569 F.2d at 736. It then went on to require just that, holding that defendant could not "use the 'Taylor' name as a trademark." Id.[3]

Even more important than that holding – which Edelman mischaracterizes while claiming that Maxwell has done so – is the Taylor court's explanation, directly on point here, that the fact that "an alleged infringer has previously sold his business with its goodwill to the plaintiff makes a sweeping injunction more tolerable." Id. at 735. That is precisely what Edelman did. He sold the Mark and all associated goodwill for a large sum. A sweeping injunction keeping him from the business would be appropriate. At a minimum, an injunction keeping him from using a mark containing the same dominant feature – "SAM" – is required. The Taylor court went on to note that "if an individual enters a particular line of trade for no apparent reason other than to use a conveniently confusing surname to his advantage, the injunction is likely to be unlimited." Id. Here, again, the parallel is striking. Mr. Edelman could have continued to use the mark NAKED FEET. Evidently, however, the goodwill associated with that mark was not as strong as that which he had sold to Maxwell. Unable to buy it back from Maxwell, he decided to take his chances on using it anyway.

---

[3] It remanded the case on the grounds that the *scope* of the injunction was overbroad; but that does not undermine the fundamental points set forth in Maxwell's opening brief or hereinabove, that use of the surname as a trademark was improper.

794666.2                                    6

### B.   The Agreement Does Not Allow Edelman's Current Infringing Use.

Edelman argues that the purchase Agreement permits his current infringing use. This is a misreading of the Agreement. The purchase and sale Agreement forbade Edelman from using his name in or on any kind of footwear or apparel at all, for three years from its signing. (Monks Decl. Ex. B). Nowhere in that clause or any other clause of the Agreement, however, does Maxwell give Edelman a license to the SAM & LIBBY® trademark once that three year period was over. To do so would have been illogical as Maxwell was paying a significant amount of money to enjoy exclusive use of the Mark, and Edelman was warranting that such rights were being conveyed without restriction. Nothing in the Agreement allows Edelman, even after termination of the three year period, to infringe the Mark. This is the distinction between "name" use and "trademark" use courts have repeatedly made in cases such as Toomey and Gucci.

When an individual sells the trademark rights in his/her personal name, he/she is not entitled to use that name, or any version of it, in a manner which would infringe the trademark he/she sold. See 2 McCarthy on Trademarks § 13:15 ("If a person whose surname has been legally adopted by a senior user, then severs his ties with that company and goes into business for himself, he has no unqualified right to use his own name, if the result is likelihood of confusion.").

> "If a person has sold a business which is identified by his personal name, the name is an asset which he has sold, and he cannot keep commercial control of the name and keep the purchase price too. Of course, the seller can use his own name to identify himself, but he has sold the right to use the name as a commercial symbol—a trademark."

2 McCarthy on Trademarks § 18:32. See Toomey, 683 F. Supp. at 877 (enjoining son of company founder from name in infringing manner); John Zink Co. v. Zinkco, Inc., 2 U.S.P.Q.2d

794666.2                                              7

1606, 1986 WL 15720 at *11 (N.D. Okla. 1986) (enjoining defendant from using marks ZINK, JACK ZINK, JOHN ZINK and ZINKCO after defendant sold plaintiff rights in JOHN ZINK®); Dovenmuehle v. Gilldorn Mortg. Midwest Corp., 871 F.2d 697, 700-01 (7th Cir. 1989) (holding that family members have no commercial rights to surname after they sold their entire interest in privately owned corporation which bore that surname). In cases like the present one, such as Toomey, Gucci, and Zink, courts routinely enjoin former company affiliates who share the company name (such as a son, grandson, etc.) from using their names in an unauthorized, trademark manner. Nothing in the Agreement requires a contrary result.

Edelman already made use of the name clause of the Agreement once when he re-entered the footwear industry with his line of footwear called NAKED FEET by Sam Edelman. Maxwell never objected to this use of Edelman's name because the trademark used on the goods was NAKED FEET, which does not infringe SAM & LIBBY®. Maxwell does not object to Sam Edelman taking credit for his own designs. Indeed, it was not Maxwell's intent to forbid Edelman from using his name for longer than the mandated three year period. However it was also clearly not Maxwell's intent to vitiate the rights it purchased for $5.5 million by allowing Edelman to infringe the Mark.

In short, the Agreement gives Edelman the right to use his name, but does not give him a license to infringe the SAM & LIBBY® Mark. Maxwell does not suggest that Mr. Edelman be prohibited from taking advantage of his personal reputation in the shoe industry, but he must be careful to do so in a manner that does not infringe the trademark rights Maxwell rightfully purchased from him. See Toomey, 683 F. Supp. at 880; 2 McCarthy on Trademarks § 18:32.

## II.     EDELMAN'S MARKS INFRINGE MAXWELL'S TRADEMARK RIGHTS.

### A.     Edelman's Marks Are Confusingly Similar to Maxwell's Mark.

Up until Edelman recently began using its marks, Maxwell enjoyed exclusive trademark rights to the word SAM in footwear.  Maxwell's SAM & LIBBY® Mark is arbitrary, federally registered and enjoys wide recognition. (Monks Decl. ¶ 4).  Prior to Edelman's infringing use, Maxwell was unaware of any other footwear manufacturer using the word SAM.  (Monks Decl. ¶ 22).  Edelman does not dispute these facts, or the strength of the SAM & LIBBY® Mark. Indeed Edelman could hardly do so, since Maxwell paid Edelman $5.5 million for these strong and exclusive trademark rights which (Edelman does not deny) is legally highly indicative of a strong trademark.  Instead, Edelman argues that many shoe manufacturers share <u>different</u> names such as Anne or Charles.  Regardless of how many shoe manufacturers may share <u>another</u> name, it is Maxwell's strong trademark rights in the word SAM that are relevant.  Proving that some other company's marks might be weak says nothing about Maxwell's mark.  The argument is irrelevant.  Here, Edelman's marks, SAMMY E and SAM EDELMAN, infringe on the trademark space belonging exclusively to Maxwell and are likely to be associated by customers with the SAM & LIBBY® line.  This is classic "likelihood of confusion."  <u>See</u> <u>Keds Corp. v. Renee Int'l Trading Corp.</u>, 888 F.2d 215 (1st Cir. 1989).

Edelman further strains credulity by arguing that "Sam" is not the dominant portion of his new mark (Edelman Br. at 9).  That new mark is shown below:



(Edelman Decl, Ex. B). The word "SAM" appears first, and appears in a typeface approximately four times[4] the size of the other word in the mark. A "dominant" portion of a trademark is the more significant portion of the mark, which can often be the first portion and/or the larger portion (and in this case is both). See 3 McCarthy on Trademarks § 23:44; Presto Prods., Inc. v. Nice-Pak Prods., Inc., 9 U.S.P.Q.2d 1895, 1897 (T.T.A.B. 1988) ("[I]t is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered."). A first name such as "SAM" is particularly likely to be dominant to the consumer who sees or hears the mark. See Bunte Bros. v. Standard Chocolates, 45 F. Supp. 478, 481 (D. Mass. 1942) ("First names in trade-marks catch the eye and ear. They are very likely to be the dominant words.")

Likewise, the dominant feature of Maxwell's SAM & LIBBY® Mark is also SAM—that name is exclusively associated in footwear with Maxwell and is the first word consumers hear and see when engaging any product from the SAM & LIBBY® line. See Presto (first part of mark dominates); Bunte, (person's first name is likely to be the dominant word in a mark).

It is proper to give the dominant portion of a mark "greater force and effect" when determining likelihood of confusion. 3 McCarthy on Trademarks § 23:44; Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 936 (4th Cir.1995) (giving greater weight to the dominant or "salient portions" of a mark). "When the dominant portions of the two marks are the same, confusion is likely." Country Floors, Inc. v. P'ship of Gepner and Ford, 930 F.2d 1056, 1065 (3d Cir. 1991).[5]

---

[4] Each letter in "SAM" is about twice the height and two to three times the width of the letters in "Edelman," giving the letters in the first word a surface area between four and six times that of the second word.

[5] Edelman's recent decision to alter his mark from SAM BY SAM EDELMAN to simply SAM EDELMAN does nothing to minimize his infringement. The mark still contains, and indeed emphasizes, the word SAM, as shown above. Both Maxwell's SAM & LIBBY® Mark and Edelman's SAM EDELMAN mark feature the name SAM as the dominant portion.

The dominant commercial impression for both Maxwell's Mark and Edelman's mark is SAM. With Maxwell previously enjoying years of exclusive recognition for the name SAM, Edelman's new use of SAM, particularly as the dominant feature of his trademark, is likely to confuse customers. See Toomey, 683 F. Supp. at 877 (finding likelihood of confusion where dominant word in infringing mark, "Toomey," was contained in plaintiff's mark); Calamari Fisheries, Inc. v. The Village Catch, Inc., 698 F. Supp. 994, 1009-1011 (D. Mass. 1988) (finding likelihood of confusion where dominant word in infringing mark, "Catch," was contained in plaintiff's mark); Checkpoint Sys., Inc. v. Check Point Software Tech., Inc., 269 F.3d 270, 281 (3rd Cir. 2001) ("[W]hen the dominant portions of the two marks are the same and the overall impression created by the marks is essentially the same it is very probable that the marks are confusingly similar") (internal quotations omitted).

### B. Edelman's Marks Are Used On The Same Class Of Goods As Maxwell's Mark.

Edelman again strains credibility in his attempts to distinguish his goods from Maxwell's. Goods need not be the same, or even directly competitive, to be deemed sufficiently "related" for a confusingly-similar trademark to result in infringement. See 3 McCarthy on Trademarks §24:24. In determining the relation between products, courts have found likelihood of confusion between such varied goods and services as deli meats and beer,[6] mustard and restaurant services,[7] supermarkets and fast-food restaurants,[8] and hoofpads and hoof-care products.[9] Here, Maxwell's Mark and Edelman's marks are both used with women's shoes, sold in department

---

[6] Frank Brunckhorst Co. v. G. Heileman Brewing Co., Inc., 875 F. Supp. 966 (E.D. N.Y. 1994).
[7] In re Mucky Duck Mustard Co., 6 U.S.P.Q.2d 1467 (T.T.A.B. 1988) (finding confusion likely between mustard and restaurant services).
[8] Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565 (Fed. Cir. 1983) (finding confusion likely between supermarkets and fast-food restaurants).
[9] Equine Tech. v. Equitechnology, Inc., 68 F.3d 542 (1st Cir. 1995) (finding confusion likely between hoof cleaner and hoof care products).

794666.2                                        11

stores and shoe stores, and marketed to women over 25.  Consumers are likely to be confused by the similarities.  See e.g. In re Apparel Ventures, Inc. 229 U.S.P.Q. 225 (T.T.A.B. 1986) (likely confusion found between SPARKS shoes and SPARKS BY SASSAFRAS for women's apparel).

In short, though the categories of goods need only be "related" for similar names to result in infringement, here, not only are they directly competitive, they are virtually identical.  See KOS Pharm., Inc. v. Andrx Corp., --- F.3d ---, 2004 WL 1146180, at *10 (3d Cir. May 24, 2004) ("Where the goods ... are directly competitive, the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products.") quoting 3 McCarthy on Trademarks §23:20:1.

Edelman's offers only one substantive response:  He claims, without any supporting evidence, that his shoes are offered at different "price points" from Maxwell's shoes.  (Opp. at 10).  Edelman's characterization of Maxwell's target customer and "price point" is unsupported by any factual evidence in his papers, for the simple reason that it is factually incorrect.  It is also irrelevant, as a price difference alone would not turn the same category of goods – footwear, and more particularly women's work footwear – into goods so distinct as to be "unrelated."  See Equine Tech. v. Equitechnology, Inc., 68 F.3d 542, 546 (1st Cir. 1995) (finding confusion where "[e]ven assuming a price differential between the products, the similarity between the goods is strong.")

Maxwell's shoes are marketed to the same class of purchasers as Edelman's shoes and are sold in the same price range.  (Monks Dec. ¶ 20).  Edelman's attempted characterization of Maxwell's shoes as being sold at a different "price point" than his does not withstand scrutiny.  On the one website cited in Maxwell's opening brief, "www.lovemyshoes.com," Edelman's shoes are offered for sale at $49.90 while Maxwell's are offered for sale for $42.90.  (Barzilay

Dec. Ex. C-D). No doubt this minimal distinction in price explains why Edelman offers no evidence of, or even asserts, what exactly the two companies' price-points are. Even assuming *arguendo* that confusion would be obviated if one shoe sold for $500 in exclusive Fifth Avenue boutiques while another sold in discount stores for $19.95 – and it is far from clear that even that price distinction would suffice, since brand names have been known to turn up in mark-down stores[10] – no such distinction exists here. Both, in fact, sell side by side for barely distinguishable prices.

In sum, the products in question are identical (women's footwear), are marketed in identical ways (e.g. in magazines and trade shows), to identical customers (women over 25) and are sold in similar retail establishments (department stores and shoe stores). These products are so closely related that they are likely to be connected in the mind of a prospective purchaser. See 3 McCarthy on Trademarks §24:24.

### C. Edelman Deliberately Chose Marks Close to SAM & LIBBY®.

As explained above, neither the Agreement, nor the fact that Edelman used his own name excuses Edelman's infringement of Maxwell's Mark. Edelman obviously knew of the SAM & LIBBY® Mark when choosing his marks. Instead of choosing a mark that avoided infringement (such as his earlier choice of NAKED FEET), Edelman chose marks which infringe rights belonging to Maxwell. While no proof of bad faith is needed to warrant injunctive relief, this deliberate choice allows an inference of bad faith on Edelman's part. See Toomey 683 F. Supp. at 878 ("Toomey was indisputably aware of the Company's mark, but he nevertheless used it.

---

[10] See e.g. Anne Klein Studio v. Hong Kong Quality Knitters, Ltd., 192 U.S.P.Q. 514, 517, 1976 WL 21093 (D. N.J. 1976) ("The hallmark of disparity in price is not always to alert the public that they are getting something different. It may be that they feel they are getting a bargain or a special.") (entering preliminary injunction despite difference in product price).

794666.2                                    13

This Court therefore holds that a presumption of bad faith on the part of Toomey has arisen and has not been rebutted.").

After having already failed with one business using a different trademark, Edelman apparently decided that he could not succeed in his new endeavor without using the goodwill of SAM & LIBBY® as a springboard. He cannot, and does not, deny knowledge of the Mark. He even volunteers the information that he consulted counsel (though interestingly the opinion of counsel on which he purports to have relied is not attached to his papers). This was no accidental or innocent adoption of a mark similar to plaintiff's but a deliberate choice to see what he could get away with.

### D.   Any Harm To Edelman Is Of His Own Doing.

Edelman argues that an injunction would harm his business. But any such effect would be of his own doing. This is not a case where a defendant has innocently adopted a mark and then been caught unawares when it later realizes there is an infringement. Edelman has known about SAM & LIBBY® since well before he chose to adopt his infringing marks. See Schawbel Corp. v. Conair Corp., 122 F. Supp. 2d 71, 85 (D. Mass. 2000) (where harm to defendant is of defendants own doing, plaintiff prevailed on balance of harms).

Edelman claims that Maxwell learned of his intended usage of the marks in January but made no effort to stop him. This assertion is factually incorrect. On January 30, 2004, immediately after learning that Edelman planned to re-enter the shoe business with infringing trademarks, counsel for Maxwell sent a cease-and-desist letter to Edelman. (Declaration of Ilan Barzilay, ¶ 2). That letter was sent by registered mail to Edelman at 11 Old Stage Coach Road in Ridgefield, CT – the same address Edelman gave to the U.S. Patent and Trademark Office in its trademark applications for SAMMY E and SAM BY SAM EDELMAN. (See Monks Decl., Ex.

794666.2                                    14

C). Instead of responding to the letter, however, Edelman refused to accept it. A true and accurate copy of the outside of the unopened envelope of that letter is attached as Exhibit A to the Declaration of Ilan Barzilay.

The letter was mailed on January 30, 2004. (Barzilay Decl., ¶ 2, Ex. A). Several attempts were made to deliver it. It was eventually marked "unclaimed" and was returned to counsel for Maxwell on March 8, 2004. (Barzilay Decl., ¶ 3, Ex. A). After realizing that Edelman had no intention of ceasing its infringement, or even accepting delivery of its cease-and-desist letter, Maxwell gathered its materials and promptly filed suit.

While he incorrectly asserts that Maxwell made no attempt to stop him when it learned of his infringement, of greater significance is that <u>Edelman</u> made no attempt to contact <u>Maxwell</u> before venturing down a path that, at best, he knew was risky. Indeed, he evidently considered it risky enough to (a) contact counsel, and (b) subsequently call up Maxwell and ask to buy the Mark back – yet never did he forthrightly ask Maxwell if the company would have any objection to his choice of marks. For him now to claim that he will be harmed because has a pending purchase order that he would like to fill hardly qualifies as a cognizable "harm." Numerous courts have noted that an infringer's potential loss of business is not cognizable harm to weigh against entry of a preliminary injunction. <u>See</u> <u>e.g.</u> <u>KOS Pharm</u>, 2004 WL 1146180, at * 24 (holding that harm to infringer from injunction, such as "changing the labeling and product inserts, product relaunch advertising and the reestablishment of goodwill, and perhaps in destroying inventory or recalling the products already distributed" is insufficient to prevent a preliminary injunction); <u>Aura Communications, Inc. v. Aura Networks, Inc.</u>, 148 F. Supp. 2d 91 (D. Mass. 2001) (entering preliminary injunction despite harms to defendant where plaintiff's federally registered mark had five years use and defendant had recently adopted infringing

mark).

In sum, Edelman's defense that he should be allowed to continue infringing because he should have been stopped sooner does not hold water. Edelman knowingly risked an infringement suit when he chose marks so close to Maxwell's Mark. Maxwell did attempt to contact Edelman and ask him to cease infringement before it filed suit. Edelman avoided acceptance of Maxwell's certified letter demanding that he cease infringement. More importantly, loss of infringing business is not cognizable harm preventing entry of an injunction. S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 379 (3d Cir. 1992) (ordering entry of injunction because "self-inflicted harm" to alleged infringer "is far outweighed by the immeasurable damage done by the infringement of [plaintiff's] trademark," despite "sympathetic position" of defendant who would have to change name under which it was operating its business). Edelman is responsible for any harm he might suffer.

That said, Edelman is not being asked to cancel any orders, terminate any customer relationships, or cease making or selling any shoes. The harm alleged by Edelman may be avoided by a simple change of the labels in his shoes. Any shoe Edelman has in inventory or "in the manufacturing process" (Edelman Dec. ¶ 19) may still be sold, if Edelman simply removes any labels with the infringing marks. Harm to Edelman may be avoided by simply adopting a different trademark, something he has apparently already done without any harmful effect. (See Edelman Dec. ¶ 14 explaining switch from SAM BY SAM EDELMAN to SAM EDELMAN).[11]

## CONCLUSION

The preliminary injunction should be granted.

                Respectfully submitted,

                MAXWELL SHOE COMPANY, INC.

                By its attorneys,

Dated: June 4, 2004        By:     /s/Michael A. Albert
                                       Michael A. Albert (BBO #558566)
                                       malbert@wolfgreenfield.com
                                     Ilan N. Barzilay (BBO #643978)
                                     ibarzilay@wolfgreenfield.com
                                     WOLF, GREENFIELD & SACKS, P.C.
                                     600 Atlantic Ave.
                                     Boston, MA 02210
                                     617.646.8000 phone
                                     617.646.8646 fax

---

[11] Should the Court feel that it cannot resolve the motion at this time due to unresolved factual issues, Plaintiff respectfully requests leave to take expedited discovery followed by further briefing and hearing on the relevant issues.