UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV-10694-RCL

MAXWELL SHOE COMPANY, INC.
Plaintiff

v

EDELMAN SHOE COMPANY, LLC,
SAM EDELMAN,
Defendants

**FINDINGS AND RECOMMENDATION ON
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
(Docket #2)**

ALEXANDER, M.J.

This is an action by Maxwell Shoe Company, Inc. ("Maxwell") against Sam Edelman and Edelman Shoe Company, LLC (collectively "Mr. Edelman") for federal and state trademark infringement, trademark dilution, false designation of origin, and state law claims of breach of contract and unfair competition. All of the claims arise from Mr. Edelman's use of certain trademarks in connection with brands of women's shoes he designed. On April 5, 2004 Maxwell moved for a preliminary injunction to prevent Mr. Edelman from using the disputed marks; the matter is before this Court pursuant to an Order of Reference requesting a Report and Recommendation on that motion. This Court heard oral arguments and carefully considered the legal memoranda, affidavits, and exhibits submitted by the parties. For the reasons set forth more fully below, this Court RECOMMENDS the motion be DENIED.

## RELEVANT BACKGROUND

SAM & LIBBY is a registered trademark associated with a line of women's shoes originally designed by Mr. Edelman, and reflects a composite of Mr. and Mrs. Edelman's first names. The SAM & LIBBY mark is "incontestable," a status bestowed on any trademark in continuous use in commerce for five years.

In 1996, Mr. Edelman sold the trademark and its associated goodwill to Maxwell for $5.5 million. The transfer of the trademark was executed by an extensive and detailed purchase and sale agreement. That agreement contained a covenant which provided that for three years after the sale of the trademark, neither Maxwell nor Mr. Edelman could use Mr. Edelman's name in any capacity relating to the marketing or sale of shoes.

In the fall of 1999, Mr. Edelman began marketing another line of shoes bearing the designation NAKED FEET BY SAM EDELMAN. That venture lasted approximately one year before it was abandoned. There is no indication of any trademark dispute regarding this line of shoes. In 2004, Mr. Edelman re-entered the women's shoe market, offering two lines of shoes under the designations SAMMY E and SAM EDELMAN ("the accused marks").[1] Maxwell thereafter brought this action concerning these two marks.

---

[1] For purposes of clarification of the pleadings, the Court notes that the SAM EDELMAN line was originally called SAM BY SAM EDELMAN, but was changed approximately one month before the commencement of this action. According to Mr. Edelman, the name change was in no way related to this action, but instead reflected marketing analyses suggesting the new mark garnered more customer appeal.

## ANALYSIS

The familiar four factors considered in a preliminary injunction analysis are: (1) the likelihood that the plaintiff will succeed on the merits, (2) the risk of irreparable harm to the plaintiff absent an injunction, (3) the balance of hardships to the parties, and (4) the public interest. Boustany v. Boston Dental Group, Inc., 42 F.Supp.2d 100, 104 (D.Mass. 1999). Although Maxwell advances several counts against Mr. Edelman, the only basis pursued on its motion for preliminary injunction is that of trademark infringement. The Court thus limits its preliminary injunction analysis to the merits of that cause of action.

In the trademark infringement context "the dispositive issue ... is the plaintiff's likelihood of success on the merits." Labrador Software, Inc. v. Lycos, Inc., 32 F.Supp.2d 31, 31 (D.Mass. 1999). This is because trademark infringement is *per se* injurious to the public in that it causes confusion as to source in the marketplace, and the harm to plaintiff's business goodwill is often incapable of monetary valuation. Camel Hair and Cashmere Inst. of Amer., Inc. v. Assoc. Dry Goods Corp., 799 F.2d 6, 14-15 (1st Cir. 1986).

To prevail on its claim for trademark infringement, Maxwell must show: (1) that it owns a protectable trademark; (2) that Mr. Edelman is using a similar mark; and (3) that Mr. Edelman's use of the accused mark is likely to cause confusion as to the sources of Maxwell's and Mr. Edelman's goods in the minds of the purchasing public. Star Financial Serv., Inc. v. AAStar Mortgage Corp., 89 F.3d 5, 9 (1st Cir. 1996). The likelihood of confusion is the "key element in any infringement action." Purolator, Inc. v.

EFRA Distributors, Inc., 687 F.2d 554, 559 (1st Cir. 1982). In the instant case, the likelihood of confusion is not just the key element, but indeed the *only* element: Mr. Edelman concedes that Maxwell owns a protectable mark, and the similarity of the marks are considered under the "likelihood of confusion" inquiry.

A court generally considers eight factors to determine the likelihood of confusion arising from a defendant's use of an accused mark. These are:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting the mark; (8) the strength of the plaintiff's mark.

Id. at 10. Among these factors, no single factor is dispositive; all must be considered. Id. To prevail, Maxwell must show a "substantial" likelihood of confusion, not just a "mere possibility" of confusion. Id. The Court proceeds with the analysis of each factor seriatim.

### *Factor 1: Similarity of the Marks*

In considering the similarity of the marks, a court considers the overall effects of the mark as a typical consumer would. I.P. Lund. Trading ApS v. Kohler Co., 163 F.3d 27, 43 (1st Cir. 1998). It is improper to "dissect" a mark into infringing and non-infringing parts: "words are not to be compared syllable by syllable, vowel by vowel and consonant by consonant." Coca-Cola Co. v. Snow Crest Beverages, 162 F.2d 280 (1st

Cir. 1947). However, a court may recognize that a mark may have a dominant portion and give that portion more weight in its comparison. Calamari Fisheries, Inc. v. The Village Catch, Inc., 698 F.Supp. 994, 1009-1010 (D. Mass. 1988).

The Court is cognizant that the first word of a mark may be "dominant" by virtue of its prime placement, Bunte Bros. v. Standard Chocolates, 45 F.Supp. 478, 481 (D.Mass. 1942), and that "if the 'dominant' portion of both marks is the same, then confusion *may* be likely, notwithstanding peripheral differences." 3 McCarthy on Trademarks and Unfair Competition §23:44 (4th Ed. 1996) ("McCarthy") (emphasis added).[2] This Court nevertheless does not find an appreciable similarity between the mark SAM & LIBBY and the accused marks, SAM EDELMAN and SAMMY E. In arriving at this conclusion, the Court considers as relevant that a good portion of shoes coexisting in the parties' market are sold under marks consisting of proper names, including Anne Klein, Franco Sarto, and Steve Madden. Indeed, in the fashion world, a trademark often has significance beyond merely an indicator of source. (At the extreme end, the brand-name itself is the *de facto* product, with the actual product on which it appears becoming somewhat incidental, as in the case of a pair of Stuart Weitzman or Jimmy Choo shoes.) Consumers in such a market, therefore, are used to paying close attention to the trademarks of products they consider purchasing, and distinguish those trademarks despite the fact that they are composed of proper names. Considering the

---

[2] The Court notes that the parties agree on the authoritative nature of the McCarthy treatise.

market (and the tendencies of consumers in that market) is necessary: "similarity of the marks must be considered in light of what occurs in the marketplace, taking into account the circumstances surrounding the purchase of the goods or services." Calamari Fisheries, 698 F.Supp. at 1009 (internal quotes omitted).

Notwithstanding the presence and primacy of "SAM" in the all the marks under consideration, the "& LIBBY" portion of Maxwell's SAM & LIBBY mark significantly distinguishes it from the accused marks. Consumers in this market are accustomed to distinguishing products along these lines. The Court FINDS that Maxwell fails to demonstrate that there is an impermissible similarity of the marks.

*Factor 2: Similarity of the Goods*

There is unquestionably a high degree of similarity in the goods. Both parties are in the business of selling women's shoes. Mr. Edelman invites the Court to distinguish the goods based on the price differential between them. According to Mr. Edelman, Maxwell's shoes are sold at a "low price" and are targeted mainly to adolescents, while Edelman's shoes are sold at a "mid-level price" and targeted to women between the ages of 25 to 55 years old. To give context to their characterizations "low price" and "mid-level price," at oral argument counsel indicated that a particular pair of SAM & LIBBY shoes sells for about $42, while a particular pair of SAM EDELMAN shoes sell for about $49.[3]

---

[3] The problem with such characterizations as "low" and "mid-level" price is that they fail to inform the analysis here. If "low" price is equivalent to $42, then query what term should be applied to discounted shoes available at affordable retailers such as DSW and to those of *haute*

Case 1:04-cv-10694-RCL   Document 38   Filed 08/05/2004   Page 7 of 15

There is some precedent in this circuit to support a distinction by price. In <u>Pignons S.A. de Mecanique de Precision v. Polaroid Corp.</u>, the court distinguished the goods at issue - both "single lens reflex cameras" - based on the differences in their physical appearance and their retail prices. 657 F.2d 482, 487-88 (1st Cir. 1981). In that case, the suggested retail price differential between the products was at least $350, the cameras in question being sold for approximately $200 to $550. In the instant case, however, it is not *a priori* clear that a $7 price differential adequately serves to distinguish the two products. Even if the price differential evinces a world of difference between the products, such a distinction here seems out of step with the purpose behind this inquiry.

The test is designed to detect the situation in which the accused infringer is marketing a product which the public mistakenly believes is being marketed by the plaintiff. Thus, if the trademark holder makes overcoats and the accused infringer makes suits, there may be a danger that the public perceives the suits as being produced by the plaintiff due to an expansion of the plaintiff's business. Restatement (Third) of Unfair Competition, §21, comment b. In this case, even taking Mr. Edelman's assertions that the shoes are indeed marketed to difference audiences as true, it is eminently reasonable for the consuming public to suspect that a low-end shoe manufacturer may make a foray into a higher-priced market. Indeed, such expansion is archetypical. The Court FINDS that this factor weighs in favor of Maxwell.

---

*couture*, which may reach several thousand dollars per pair.

### *Factors 3, 4, 5: Similarity in channels of trade, parties' advertising, and prospective purchasers*[4]

There seems no dispute here that this triptych of factors weighs in favor of Maxwell because of the parties' similarities in trade channels, advertising, and potential market. Maxwell points out, uncontradicted by Mr. Edelman, that both the SAM & LIBBY and SAMMY E lines of shoes were on display in at least two of the same industry trade shows. This is a significant number; at oral argument, counsel indicated that there are approximately four such trade shows annually. Maxwell further points out that at least one Internet retailer is selling both the SAMMY E and SAM & LIBBY lines.

The class of prospective purchasers comprise women seeking to spend a particular price on shoes. Even taking the assertion that Maxwell's shoes are targeted at young women and Edelman's to mature women as true, there is sufficient proximity in these classes of purchasers to cause concern. Indeed, young women eventually mature, and presumably their taste in shoes does with them.

Finally, the parties' advertising channels is not an issue of contention; both advertise in similar channels, e.g. print media.

This Court thus FINDS that these three factors weigh in favor of Maxwell.

### *Factor 6: Evidence of Actual Confusion*

Maxwell points to no evidence of actual confusion. It points to Tamel Corp. v.

---

[4] It is often appropriate, as it is here, to consider these factors together. Star Financial, 89 F.3d at 10.

Reebok Int'l., Ltd, 774 F.Supp. 49, 55 (D. Mass. 1990), in which that court found the absence of such evidence "neither surprising nor significant" due to the early procedural posture of the case: the accused product had not been shipped to any retailers as of the time of the preliminary injunction motion. From the record before this Court, the extent to which the accused products in the instant case have reached the consuming public is unclear. Maxwell points to at least one retailer who sells an accused product (together with Maxwell's product, thus enhancing the potential for actual confusion). On the other hand, the fact that the accused product was presented at an industry trade show in February, 2004 presumably means the shoes were not available to the public before then. Given that Maxwell's brief was submitted in early April 2004, it seems there was little time for any actual confusion to occur. In any event, Maxwell need not show evidence of actual confusion to prevail. Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 818 (1st Cir. 1987). The Court FINDS the record on this point to be rather speculative and concludes that this factor does not weigh in favor of either party.

***Factor 7: Mr. Edelman's Intent***

Maxwell paints a picture of Mr. Edelman as having sold a valuable trademark for a significant amount of money, and now attempting to unfairly capitalize on the associated goodwill by using his own name. It cites numerous cases which embody the rule: "If a person whose surname has been legally adopted by a senior user, then severs his ties with that company and goes into business for himself, he has no unqualified right to use his own name, if the result is likelihood of confusion." 2 McCarthy §13:15. *See, e.g.*, Taylor

Wine Co. v. Bully Hill Vineyards, Inc., 569 F.2d 731 (2nd Cir. 1978) (grandson of founder of Taylor Wine Co. enjoined from using the Taylor name to sell wine produced by his Bully Hill vineyard, where grandson was formerly employed by Taylor Wine Co. before starting Bully Hill); Levitt Corp. v. Levitt, 593 F.2d 463 (2nd Cir. 1979) (Mr. Levitt, original founder of Levitt Construction Company enjoined from using his own name in connection with housing developments, where he sold his entire interest in construction company, including trademarks and goodwill, prior to the commencement of the accused housing development's construction); Gucci v. Gucci Shops, Inc., 688 F.Supp. 916 (S.D.N.Y. 1988) (Paolo Gucci, former employee of and grandson of founder of Gucci Shops, a popular manufacturer of leather goods sold under the trademark Gucci, enjoined from using his name as a trademark.) This rule embodies the decision that, on balance, the right of a person to use his own surname is outweighed by the public's right to not be deceived. 2 McCarthy §13:8. Implicit in the recognition of that risk of deception is that one's surname can be distinctive.[5]

Maxwell's case is based on its ownership of a mark containing only Mr. Edelman's first name, not his last name. As the phrase "surname" is used in trademark law, it does not appear to encompass first names. For example, cases concerning first names are explicitly addressed separately in McCarthy's treatise. 2 McCarthy §13:20.

Without undertaking the delicate task of balancing the risk of public confusion

---

[5] The word "distinctive" here is meant to have its ordinary meaning, and is not to be understood in the technical sense as arbitrary, suggestive or descriptive with secondary meaning.

which may arise from the use of a first name against one's right to use their first name, the Court declines to apply a Levitt-type rule in this case for two reasons. In the cases discussed above, the defendant's name is substantially identical to the plaintiff's mark. In this case, Maxwell's mark is SAM & LIBBY, not merely SAM, thus making the Levitt rule somewhat remote to the facts of this case. Secondly, if a court ultimately finds the use of one's first name to be impermissible, a common remedy is to require that person to use their (more distinctive) full name to ameliorate any risk of consumer confusion. 2 McCarthy §13:20. With regard to the SAM EDELMAN mark, Mr. Edelman's use of his entire name serves this purpose.

That issue aside, Mr. Edelman's actions in marketing his shoes evinces good faith: prior to marketing any shoes under either of the accused marks, Mr. Edelman obtained an opinion of counsel regarding the possible liability that may result as a consequence of using either name. Mr. Edelman's good faith reliance on counsel's non-infringement opinion removes any doubt that Mr. Edelman sought to market his shoes under the accused designations for any improper purpose. DeCosta v. Viacom Int'l, Inc., 981 F.2d 602, 612 (1st Cir. 1992).

Thus, after careful consideration, the Court FINDS that there is not a showing of malfeasance or improper intent in Mr. Edelman's use of his name in conjunction with the marketing of his shoes.

***Factor 8: Strength of Maxwell's Mark***

The factors useful in determining the strength of a trademark include: "(1) the

length of time the mark has been used and the plaintiff's relative renown in its field; (2) the strength of the mark in plaintiff's field of business, especially by looking at the number of similar registered marks, and (3) the plaintiff's actions in promoting its mark." Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 32 (1st Cir. 1989).

The SAM & LIBBY'S mark has been in use since 1988, which is sufficiently long to indicate a strong mark. Equine Technologies, Inc. v. Equitechnology, Inc., 68 F.3d 542, 546 (1st Cir. 1995) (upholding a determination that a mark is moderately strong after four years' use as not clearly erroneous.) Maxwell further asserts, uncontroverted by Mr. Edelman, that it is the only user of a mark which contains "SAM" in the women's shoe world, evincing some degree of distinctiveness in its market. Finally, Maxwell asserts it spends over a million dollars annually to promote the SAM & LIBBY'S mark, further pointing to a strong mark. The Beacon Mut. Ins. Co. v. Onebeacon Ins. Group, --- F.3d ---, 2004 WL 1562558 (1st Cir.) (annual investment in promoting mark in excess of $1.3 million evincing a strong mark.)

This Court FINDS that factor weighs in favor of Maxwell.

***Weighing the Factors***

The results of the inquiries above can be concatenated as follows: Maxwell and Mr. Edelman market similar goods, with similar channels of trade, similar advertising, and similar prospective customers. Maxwell identifies its goods in the market by trademark deserving relatively strong protection. Such a constellation augers some support in favor of Maxwell. But as importantly, Mr. Edelman identifies his goods by a

designation, adopted with no improper purpose, which is not similar to Maxwell's trademark.

The similarities relied upon by Maxwell are to be expected in *any* direct competitor of Maxwell's. Indeed, the enumerated similarities are essentially the definition of a competitive product in a free market.

The purpose of trademark law is to prevent the use of the same or similar marks in a way that confuses the public about the actual source of the goods or service. Star Financial, 89 F.3d at 9. Whatever trademark protection is entitled to Maxwell, it does not extend so far as to allow them to shut down each and every legitimate competitor. Such a result would be inapposite to the venerable principles of antitrust legislation. *See, e.g.,* Standard Oil Co. of New Jersey v. U.S., 221 U.S. 1 (1911).

The legitimacy of Mr. Edelman's competition is evidenced by the clearly dissimilar designations used to identify his products. Indeed, if a hypothetical third person with no prior association with SAM & LIBBY were to begin marketing shoes under the name SAM MALONE, many of Maxwell's arguments are unchanged. The only difference between the hypothetical case and Mr. Edelman's case is Mr. Edelman's prior association with the Maxwell's mark. If the consuming public is unaware of this prior association to begin with, then this association amounts to naught. Whatever prior relationship or bad blood that exists between the parties which heightens Maxwell's perception of improper conduct on Mr. Edelman's part, the stark dissimilarity of the relevant marks and Mr. Edelman's caution in obtaining a non-infringement opinion of

counsel indicate nothing but legitimate competition – at least at this early stage. The Court understands Maxwell's concerns, but those concerns are not presented in a vacuum; they arise in the context of a motion for preliminary injunction – a context that demands, *inter alia*, a showing of likelihood of success on the merits. That showing is not extant here.

At trial, when critical facts such as evidence of actual confusion, or an accurate measurement of the extent to which the consuming public associates Mr. Edelman's name with the SAM & LIBBY trademark can be more fully borne out, an injunction may issue. Without having these critical facts before the Court, however, it is improperly hasty to issue one at this time.

## CONCLUSION

For the foregoing reasons, this Court RECOMMENDS that Maxwell's motion for preliminary injunction be DENIED.

_8/5/04_
Date

United States Magistrate Judge

## **NOTICE TO THE PARTIES**

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to this proposed report and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review. *See* United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1986); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980). *See also* Thomas v. Arn, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111, 106 S. Ct. 899, 88 L.Ed. 933 (1986).