IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAXWELL SHOE COMPANY, INC., <br><br> Plaintiff, <br><br> v. <br><br> EDELMAN SHOE COMPANY, LLC AND SAM EDELMAN <br><br> Defendant. | CIVIL ACTION NO. 04-CV-10694-RCL |

**PLAINTIFF MAXWELL'S OBJECTIONS TO THE MAGISTRATE
JUDGE'S FINDINGS AND RECOMMENDATION ON
<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

Plaintiff Maxwell Shoe Company, Inc. ("Maxwell") respectfully objects to the Findings and Recommendation ("Recommendation") of Magistrate Judge Alexander with respect to Maxwell's Motion For Preliminary Injunction against Defendants Edelman Shoe Company, LLC and Sam Edelman ("Edelman"). While the majority of the Magistrate Judge's analysis and conclusions regarding the eight factors relevant to the central inquiry concerning likelihood of confusion are sound, the Recommendation is erroneous in two respects. First, the Magistrate Judge wrongly concluded that Edelman's SAM EDELMAN and SAMMY E marks are not likely to be found confusingly similar to Maxwell's SAM & LIBBY® mark. Second, the Magistrate Judge wrongly determined that Edelman's adoption of his mark was in good faith, improperly relying on an alleged opinion of counsel that is not in the record, and failing fully to consider the admitted strength of Maxwell's rights in its Mark.

This is an unusual trademark infringement case. Eight years ago, Edelman sold Maxwell the mark at issue, along with all associated goodwill, for $5.5 million. Now,

Edelman seeks to repossess the goodwill that he sold for a significant sum, by adopting a confusingly similar mark and creating a public perception that he is associated with a mark he no longer owns. Edelman recently introduced a line of footwear very similar in style, market niche, and price-point to Maxwell's SAM & LIBBY® line. He is branding his shoes with the trademark SAM EDELMAN,[1] in an apparent attempt to create a marketplace impression that his new products are associated with the famous SAM & LIBBY line that he no longer owns (having sold it for valuable consideration to Maxwell). Precisely because he did once own it, and because the Mark was originally named after him and his wife, it is especially likely that confusion as to source, origin, or association will result. Edelman cannot sell a mark for millions of dollars and then turn around and infringe that same mark—he cannot have his cake and eat it too.

These objections will focus on two errors in the analysis set forth in the Recommendation. First, in determining likelihood of confusion, the Recommendation does not focus on the similarity of commercial impression between the marks at issue, as required by law. While acknowledging the dominance of the word SAM in both plaintiff's and defendant's marks, the Recommendation nonetheless rejects the conclusion that confusion is likely, basing this result largely on the supposed similarity of certain third party marks to each other. The Recommendation erroneously suggests that because certain third party marks that are not at issue in this case – and are of unknown strength – may seem similar to each other, Edelman's mark is not similar to Maxwell's mark. The similarity of third party marks to each other has no bearing on whether Edelman's SAM EDELMAN and SAMMY E marks are confusingly similar in use and

---

[1] Originally he used the marks SAMMY E and SAM BY SAM EDELMAN. During the course of the preliminary injunction proceedings, he advised Maxwell and the Court that his current intent is to use the mark SAM EDELMAN. Accordingly, this brief focuses primarily on that trademark.

appearance to Maxwell's strong and distinctive SAM & LIBBY® mark for which Maxwell paid defendant Edelman over $5 million.

Second, the Recommendation errs in concluding that Edelman acted in good faith when selecting a pair of marks similar to the very trademark that he had previously sold to Maxwell. The Recommendation initially recognizes that a seller of a mark may not attempt to repossess the goodwill of that sold mark by adopting a similar mark, but then wrongly fails to apply that principle of trademark law to the marks at issue here. In particular, it reaches a conclusion of "good faith" based on a supposed opinion of counsel obtained by Edelman prior to taking action. Nothing in the record supports this conclusion. Indeed, from the record, it is impossible to determine what the opinion held, whether it was adequately founded, or properly considered. Nothing in the record even establishes whether the opinion's conclusions were favorable or unfavorable to Edelman's position, and thus whether Edelman's supposed reliance upon it could possibly justified his conduct. Inasmuch as this assessment of the good faith or bad faith of the defendant was the second of only two factors (out of eight) that the Magistrate found to *support* Edelman's opposition to the preliminary injunction, this error was material to the outcome.

The remainder of the Magistrate's Recommendation, including the findings involving the other factors of likelihood of confusion, was soundly based in the facts and the law.

While Maxwell need not prevail on all eight factors to be entitled to a preliminary injunction, the Magistrate determined that five of them favor Maxwell and that one is neutral. These Objections challenge the remaining two, which the Magistrate found to

favor Edelman. Because the eight factors, taken together, favor a finding that Edelman's trademark usage creates a likelihood of confusion, Maxwell respectfully requests that this Court grant the requested preliminary injunction and enjoin Edelman from using the SAMMY E and SAM EDELMAN marks.

## BACKGROUND

A more complete discussion of the facts of this case may be found in Maxwell's previously filed preliminary injunction papers. For purposes of these objections, a brief recitation of the most relevant facts follows.

Both Maxwell and Edelman sell women's footwear. In 1996, plaintiff Maxwell purchased the trademark SAM & LIBBY® ("the Mark") for use on footwear from defendant Edelman for $5.5 million.[2] (Recommendation ("Rec.") at 2). In 1999, Edelman tried to re-enter the footwear market using the trademark "NAKED FEET by Sam Edelman," but this venture failed.[3] (Rec. at 2). Recently Edelman decided again to re-enter the footwear market, this time using the marks SAM EDELMAN and SAMMY E – trademarks which (as used) are much closer in use, appearance, and association to the original SAM & LIBBY® Mark.[4] Edelman's new marks are used on the same kind of women's dress footwear products as plaintiff's Mark (Rec. at 6-7), and are sold in the same channels of trade, using similar advertising, to the same class of prospective

---

[2] The SAM & LIBBY® Mark was originally created by combining Edelman's first name and his wife's first name.

[3] Maxwell had (and still has) no objection to Edelman's use of the NAKED FEET mark.

[4] Edelman originally adopted the mark SAM BY SAM EDELMAN but changed to just SAM EDELMAN after the Complaint was filed.

purchasers. (Rec. at 8). These facts are effectively undisputed. It is also effectively undisputed that the products are sold at similar price points.[5]

Also undisputed is the fact that prior to Edelman's adoption of its present marks, Maxwell was the only women's footwear manufacturer to use the word SAM in its trademark. (Rec. at 12). Maxwell's SAM & LIBBY® Mark has been in use since 1988, is the subject of millions of dollars of advertising and is undisputedly a strong mark. Id. Maxwell's Mark is also protected by several federal trademark registrations covering both the stylized version of the Mark and its "block letter" form, which protects the words of the Mark regardless of stylization. (Declaration of Roger Monks at ¶¶ 5-9).

By adopting his new marks SAM EDELMAN and SAMMY E, Edelman, the previous owner of the SAM & LIBBY® Mark, seeks to re-appropriate the goodwill which he sold to Maxwell for millions of dollars. Edelman's marks wrongfully encroach on the exclusive zone of consumer awareness purchased by Maxwell from Edelman. Indeed, Edelman's marks highlight the word SAM – the portion of the mark which is dominant in Maxwell's mark as well, and which only Maxwell had previously used. As shown below, Edelman's mark makes SAM the dominant feature of its mark:



(Declaration of Sam Edelman, Ex. B).

---

[5] Edelman argued that there was a significant retail price difference. He offered no evidence of any such distinction, however – indeed, he never said what either company's prices were. Maxwell pointed out in its papers that, in at least one retail location it has identified which sell both products, the price points were $42.90 and $49.90 respectively (see Barzilay Dec., Exs. C, D) – a distinction which does not serve to materially distinguish the two products by price. The Magistrate properly rejected Edelman's unfounded contention that there was any significant price distinction. (Rec. at 7).

Having sold the mark and associated goodwill to Maxwell for $5.5 million, Edelman no longer has the right to associate himself with it, or profit from its goodwill, in any way. He apparently realized and acknowledged that fact when he subsequently adopted the mark NAKED FEET for his new shoe line.[6] Evidently, however, that venture was unsuccessful. Now, he seeks to re-enter the footwear market by co-opting the goodwill he sold Maxwell, and choosing marks close to Maxwell's and reminiscent of his own former connection to Maxwell. He does so by making their common word – SAM – the dominant feature of his new mark.

## ARGUMENT

Edelman's trademarks are likely to cause confusion in the marketplace. When the two errors of the Magistrate's Recommendation are corrected, Maxwell respectfully requests it be granted a preliminary injunction prohibiting Edelman from appropriating the goodwill it had sold to Maxwell for millions of dollars.

This Court can accept, reject, or modify the recommendations of magistrate judges concerning dispositive motions after making a "de novo determination upon the record." Fed. R. Civ. P. 72(b). See also Gioiosa v. United States, 684 F.2d 176, 178-180 (1st Cir. 1982) (vacating a district court's approval of a magistrate judge's recommendation because the district court had purported to apply a clearly erroneous standard of review).

---

[6] As the original trademark purchase and sale agreement permitted, Edelman noted that this NAKED FEET line was "by Sam Edelman." The agreement prohibited all use of his name in the shoe business for three years from the sale of the SAM & LIBBY Mark to Maxwell. Thereafter, Edelman or his wife Libby Edelman were entitled to use their names – not, of course, as a *trademark* (having sold the right to make trademark usage of the Sam and Libby names to Maxwell), but as an indicator of the designer. Similarly, Edelman is free to adopt any non-infringing trademark he wants and to note that it is "by Sam Edelman." What he cannot do is use the confusingly similar mark SAM EDELMAN itself as his trademark. Indeed, by Edelman's logic, he could start using SAM & LIBBY as a mark since those are, after all, his and his wife's names. That is not, and cannot be, the meaning of the agreement, and numerous courts facing similar issues have so held as discussed in text below.

Based on the record before the Court, Maxwell is entitled to a preliminary injunction to prevent Edelman's infringement. The key factor in determining infringement is likelihood of confusion. (Rec. at 3); Purolator, Inc. v. EFRA Distrib., Inc., 687 F.2d 554, 559 (1st Cir. 1982). No separate showing of irreparable harm is needed to warrant a preliminary injunction in trademark cases, since a showing of likelihood of success creates a presumption of irreparable harm. Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 640 (1st Cir. 1992); I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998) ("When considering claims based on copyright, trademark or trade dress infringement, irreparable harm may be presumed even in the absence of demonstration of actual injury").

To determine whether a likelihood of confusion exists, courts in the First Circuit consider eight factors: (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark. Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 817 (1st Cir. 1987).

The Magistrate correctly determined that factors (2), (3), (4), (5), (6) and (8) all favor Maxwell and its request for injunctive relief, save No. 6 which it correctly found to be neutral.[7] The Recommendation erred in its analysis of factors No. 1 (the similarity of the marks) and No. 7 (the defendant's intent in adopting its mark).

---

[7] For a full discussion of these factors, Maxwell respectfully directs the Court's attention to Maxwell's original preliminary injunction papers (including an opening brief and a reply brief, and accompanying affidavits).

When these errors are corrected, and the eight factor test analyzed, Maxwell should be found to be entitled to an injunction.

## I. EDELMAN'S MARKS ARE CONFUSINGLY SIMILAR TO MAXWELL'S MARK.

Until Edelman's recent activity, the only trademark in women's footwear to use the word SAM was SAM & LIBBY®, as Edelman well knew. His new marks not only incorporate SAM, but make it dominant in such a way that will confuse consumers with regard to the products' source and/or their association with Edelman. Courts do not compare trademarks in a vacuum. Calamari Fisheries, Inc. v. Village Catch, Inc., 698 F. Supp. 994, 1009 (D. Mass. 1988) ("Similarity of the marks must be considered in light of what occurs in the marketplace"). The fact that Edelman was previously associated with the SAM & LIBBY® Mark makes his current use of a "SAM" trademark even more likely to confuse consumers. By making SAM the dominant portion of his new marks Edelman falsely suggests that there is an association between his new product line and Maxwell's existing one, thereby trading off of Maxwell's goodwill. Aura Communs., Inc. v. Aura Networks, Inc., 148 F. Supp. 2d 91, 97 (D. Mass. 2001) (confusion as to the association between plaintiff and defendant is actionable for trade-name infringement). The Recommendation erred in that it based its conclusion not on the similarity of Edelman's marks to Maxwell's Mark and Edelman's former association with SAM & LIBBY®, but rather on the trademarks of third parties.

While the Magistrate Judge acknowledged the "presence and primacy" of "SAM" in all of the relevant marks at issue, see Rec. at 6, the actual analysis concerning the similarity of the marks nevertheless fails to take that reality to heart. Instead of comparing Edelman's marks with Maxwell's Mark to determine their similarity to each

other, the Recommendation erroneously focuses on certain third-party marks and their similarity to other third-party marks. The Recommendation determines that since many marks in the footwear industry consist of proper names, there is no substantial similarity. (Rec. at 5).

This analysis is in error. First, the proper focus of a similarity inquiry is the subject marks, not third-party marks irrelevant to the trademark dispute. See Donohue & Assoc., Inc. v. Teunissen, 131 F.3d 1210, 1215 (7th Cir. 1997) (noting that the relevant comparison is between the disputed marks being used). Second, the Recommendation's conclusion about the consuming public is without support in the record. The Recommendation states:

> Consumers in such a market, therefore, are used to paying close attention to the trademarks of products they consider purchasing, and distinguish those trademarks despite the fact that they are composed of proper names.

(Rec. at 5).

This assertion is without factual support in the record. No evidence was offered by Edelman that consumers in the shoe market "are used to paying close attention" to those other trademarks; and even if there were such evidence, it would still be irrelevant to a determination of the similarity of the marks at issue in this case.

Even assuming that the Magistrate Judge was right that consumers of women's dress shoes are used to choosing between two brands of shoes both of which include the name "Anne" as part of the trademark, Maxwell is (up until now) the only shoe manufacturer to use the name "SAM" for the products at issue here. It is that name, not another name such as "Anne," that must be considered here. Whether "Anne" is a strong

or weak mark in connection with shoes is not reflected in the record of this case; nor in any case is it the relevant question.

Maxwell adduced considerable evidence of the strength of the SAM & LIBBY mark – including its inherently arbitrary status;[8] the multi-million dollar purchase price paid to Edelman for the mark itself; the millions invested by Maxwell in promotion of the mark; the over $100 million in sales made under the mark; the uniqueness of the mark in the industry; the primacy and distinctiveness of the first name SAM; and other factors set forth in greater detail in the preliminary injunction briefing. Indeed, Edelman did not genuinely dispute that the mark was strong. By contrast, no evidence has been offered as to whether a trademark containing a different name such as "Anne" is a strong trademark in connection with women's footwear.

Since 1996, SAM & LIBBY® has been the one brand of women's shoes which uses a trademark containing the name SAM. Edelman himself used to be associated with that mark until he sold it to Maxwell. Shoe consumers, knowing that only one shoe source uses SAM as a trademark, and knowing that Sam Edelman used to be associated with that source, are likely to be confused by his sudden re-use of marks appropriating the same dominant identifying feature and trademark space. Edelman's marks deliberately emphasize a feature in common with Maxwell's senior mark in an attempt to trade off that senior mark's goodwill. It is well established that, when an infringing party

---

[8] Maxwell's mark SAM & LIBBY® is classified as an "arbitrary" mark, which gives it the highest level of protection on the strength (distinctiveness) spectrum. Digital Equip. Corp. v. AltaVista Tech, Inc., 960 F. Supp. 456, 478 (D. Mass. 1997) citing S.S. Kresge Co. v. United Factory Outlet, Inc., 598 F.2d 694, 696 (1st Cir. 1979) (noting that arbitrary marks are the marks most deserving of protection); accord The Alta Vista Corporation, Ltd. v. Digital Equip. Corp., 44 F. Supp. 2d 72, 79-80 (D. Mass. 1998). Arbitrary marks are presumptively strong marks. Stop & Shop v. Big Y Foods, 943 F. Supp. 120, 125 (D. Mass. 1996). See also Virgin Enters. v. Nawab, 335 F.3d 141, 147 (2d Cir. 2003) ("[T]he law accords broad, muscular protection to marks that are arbitrary or fanciful in relation to the products on which they are used").

has previously sold his goodwill, "sweeping injunctive relief" to prevent him from attempting to recapture it is warranted.  Taylor Wine Co. v. Bully Hill Vineyards, Inc., 569 F.2d 731, 735 (2nd Cir. 1978); accord Levitt Corp. v. Levitt, 593 F.2d 463, 468 (2nd Cir. 1979).   In order to protect the property interest of the purchaser in this situation, "the courts will be especially alert to foreclose attempts by the seller to 'keep for himself the essential thing he sold, and also keep the price he got for it[.]'"  Levitt, 593 F.2d at 468 (internal citation omitted).

The analysis of conventional "proper names" employed in the Magistrate's Recommendation does not apply here.  The absence of any surname in SAM & LIBBY® ensures the primacy of SAM, which indeed is even more dominant than the typical first word of a mark.  Much the same is true of SAMMY E, in which the root word SAM remains the dominant feature.  Furthermore, the dominance of "SAM" in Edelman's mark SAM EDELMAN (as used) belies any suggestion that Edelman rather than Sam is the dominant feature.  Indeed, the letters in the word SAM occupy about four to six times the surface area of the other word, Edelman:



The first word in a mark, and likewise a person's first name, both tend to be the "dominant" portion of a mark.  Here, SAM is both of these things.  See Bunte Bros. v. Standard Chocolates, 45 F. Supp. 478, 481 (D. Mass. 1942) ("First names in trade-marks catch the eye and ear.  They are very likely to be the dominant words"); Calamari Fisheries, Inc. v. The Village Catch, Inc., 698 F. Supp. 994, 1009-1011 (D. Mass. 1988)

(recognizing the dominant portion of a mark and giving the dominant portion more weight); 3 McCarthy on Trademarks § 23:44 (It is proper to give the dominant portion of a mark "greater force and effect" when determining likelihood of confusion); Country Floors, Inc. v. P'ship of Gepner and Ford, 930 F.2d 1056, 1065 (3d Cir. 1991) ("When the dominant portions of the two marks are the same, confusion is likely").

By omitting a surname in one of his new marks and deliberately downplaying it in the other, Edelman created a pair of marks that are very different from those cited by the Magistrate Judge (e.g., "Steve Madden") in that they discourage or even preclude consumers from identifying the underlying products on the basis of a surname. The fact that a shopper might have learned to distinguish between ANNE JORDAN and ANNE KLEIN therefore has no bearing on the similarity between SAM & LIBBY® and Edelman's two marks. Moreover, there is no evidence that those "Anne" marks were once formerly associated with each other. Those examples, therefore, are inapposite as they do not implicate the policy favoring "sweeping injunctive relief" to keep a former owner of a mark from attempting to repossess the goodwill he previously sold.

On *de novo* consideration, Maxwell respectfully requests that the Court find a likelihood that Edelman's marks will be found confusingly similar to Maxwell's mark.

## II. THE MAGISTRATE JUDGE ERRED IN DETERMINING EDELMAN'S INTENT.

### A. Edelman's Adoption of Marks Containing "SAM" Was Bad Faith.

In selecting marks very similar to the trademark that he previously had sold to Maxwell, Edelman sought to profit from the very goodwill to which he had previously agreed to renounce all rights in exchange for more than five million dollars. Edelman's

- 12 -

choice likewise marked an effort to capitalize upon the additional millions that Maxwell has since spent on advertising to augment the value of its purchase.

Instead of addressing the dealings between the parties and the associated evidence that Edelman deliberately sought to use a mark that consumers would confuse with SAM & LIBBY®, the Magistrate Judge simply observed that both Maxwell's mark and Edelman's SAM EDELMAN mark contained elements other than SAM itself. This fact does not change the reality that Edelman is attempting to hijack Maxwell's goodwill by means of a mark that is confusingly similar to SAM & LIBBY®.

The Magistrate distinguished the authority relied upon by Maxwell regarding the use of a name as a trademark – a rule aptly summed up by the Magistrate as "the right of a person to use his own surname is outweighed by the public's right not to be deceived." (Rec. at 10, citing 2 McCarthy § 13:8). Maxwell had cited considerable support for this proposition, which holds that when an individual uses his/her name as a trademark and then later sells or becomes disassociated with that trademark he/she may not then continue using that mark simply because it is his/her name. See, e.g., R.J. Toomey Co. v. Toomey, 683 F. Supp. 873, 879 (D. Mass. 1988) (enjoining junior user's use of his name as a trademark); A.V. by Versace, Inc. v. Gianni Versace, S.p.A., 2002 WL 2012618 at *12 (S.D. N.Y. 2002) ("Modern jurisprudence has evolved such that there is no inherent right to use one's own name as a trademark") (barring junior user from any use of VERSACE name); Basile, S.p.A. v. Basile, 899 F.2d 35, 39 (D.C. Cir. 1990) (junior user of personal name mark enjoined from causing confusion with senior user); Joseph Scott Co. v. Scott Swimming Pools, Inc., 764 F.2d 62 (2d Cir. 1985) (junior user of personal name mark enjoined from causing confusion with senior user).

The Magistrate correctly notes that those cases involved last names, not first names; but that is a distinction with no legal difference. That those cases involved a surname is a coincidence of the facts of the cases, not an underpinning of their holding. If a former trademark user sells the rights to his/her *given* name as a trademark, the seller should be as bound by that conveyance, and the buyer as protected, as if it were his or her surname. The difference between a surname and a first name is a factual detail with no bearing on the underlying trademark issue involved—the first name itself is deserving of trademark protection. Cf. Peaceable Planet, Inc. v. Ty, Inc., 362 F.3d 986 (7th Cir. 2004) (holding that a first name used a trademark absent a surname is just as entitled to trademark protection as a surname would be). That Maxwell's trademark is strong and entitled to protection is unaffected by its being a combination of two first names.

The Magistrate held that because Edelman added his surname to his mark there was no longer any risk of consumer confusion. (Rec. at 11). As discussed above, this holding neglects the necessary analysis of comparing the dominant portions of the marks and considering how their appearance and similarities may confuse consumers. It also entirely overlooks the confusion as to association that Edelman's conduct is likely to create. In the context of Edelman's intent, however, it is clear that Edelman chose his mark (and deliberately made "SAM" four times as large as "EDELMAN") to benefit from the goodwill associated with Maxwell's Mark.

Edelman knew that Maxwell owned the rights to SAM & LIBBY® and that Maxwell was the only shoe manufacturer using the name SAM. Instead of attempting to build up goodwill in a new mark of his choice, Edelman chose a mark confusingly similar to Maxwell's, and even highlighted that similarity by emphasizing the one word the

marks have in common. The additional elements of Edelman's marks do not create a distinct enough commercial impression to alter the likelihood of confusion with Maxwell's mark.

It is inequitable to allow a company's founder or employee to use his own name as a trademark after severing ties with the firm "if the result is likelihood of confusion." 2 McCarthy On Trademarks § 13.15. Accepting the Magistrate Judge's recommendation would indeed open the door for those who use their names as trademarks to convince buyers to pay hefty sums for marks which then become worthless by virtue of the seller's infringement. Others could follow Edelman's lead and alter secondary components of the transferred marks while retaining the dominant elements that are needed for tapping into consumers' goodwill (and ultimately their pocketbooks).

Edelman's deliberate choice to emphasize the SAM element of the trademark with a typeface some four times the size of the other word in the mark strongly suggests bad faith. The dominant features of the respective marks, and indeed the entire marks themselves, are "substantially identical" and likely to confuse consumers. Edelman plainly knew this, from his prior association with Maxwell; which is why he deliberately chose trademarks extremely close to Maxwell's mark.

    **B.**    **An Unseen Purported Opinion of Counsel Does Not Justify A Finding That Edelman Acted In Good Faith.**

The Magistrate Judge erred as a matter of law in relying on Edelman's supposed "opinion of counsel" to determine that he acted in good faith. There is no information in the record from which to assess what this purported opinion stated, whether or not the opinion was based on adequate analysis, or even what its conclusions were. Hence, there

was no basis from which the Court could properly infer that Edelman had relied upon it and/or was justified in doing so. Edelman himself makes only the theoretical point that "[g]ood faith reliance on a competent opinion of counsel evidences good faith adoption of a mark." (Edelman Br. at 11). Glaringly, Edelman fails to set forth what that opinion contained, why or how it should be deemed a "competent opinion of counsel," or even that Edelman actually relied on it. The Recommendation does not and cannot point to anything in the record suggesting either that Edelman relied on the legal opinion in good faith or that the opinion itself was adequate. If anything, this factor points toward bad faith. What it does establish is that Edelman *realized* that there was a potential legal problem here. He did not blindly or innocently adopt a mark with no notice of conflicting rights – he walked right into this problem, and even allegedly consulted counsel about it. Having told us that much, Edelman cannot now simply ask the Court to infer that the opinion was (a) favorable; (b) competent; and (c) actually and in good faith relied upon, all without any evidence.

Parties cannot establish that they used a mark in good faith simply by claiming to have relied upon legal advice that is not incorporated into the record. For example, one district court recently refused to allow a defendant to rely upon the advice of counsel that it had steadfastly refused to disclose. Door-Oliver, Inc. v. Fluid-Quip, Inc., 834 F. Supp. 1008, 1012 (N.D. Ill. 1997). See also Takecare Corp. v. Takecare of Oklahoma, Inc., 889 F.3d 955, 957-58 (10th Cir. 1989) (affirming an award of attorneys' fees and noting that by failing to document what counsel had advised, the defendant had likewise failed "to prove reasonable reliance").

Moreover, not all favorable legal advice (even assuming Edelman had any) suffices to establish good faith. See, e.g., Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc., 909 F. Supp. 896, 907 (S.D.N.Y. 1995) (granting a preliminary junction and explaining that the "defendants' bad faith is not negated by the fact that they allegedly sought an opinion from counsel" because the supposed opinion letter was "superficial" at best and didn't include any analysis); see also John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 977 (11th Cir. 1983) (holding that the jury could have concluded from the defendant's consultations with trademark counsel that it was seeking to trade on the reputation of the plaintiff's trademark by using a mark that was as similar as possible).

Here, the only indication that Edelman consulted with counsel is buried in the Edelman Declaration. (Edelman Dec. ¶ 13). Even in that Declaration, Edelman refuses to testify as to what the opinion of counsel was, let alone if it was even favorable to Edelman. The relevant portion of Edelman's Declaration states:

> Before adopting these names, I consulted with counsel to assess whether these names were available for use and registration as trademarks. I provided counsel with a copy of the Trademark and Intellectual Property Rights Purchase and Sale Agreement with Maxwell. Based upon counsel's assessment, I adopted these names as my trademarks and filed applications for Federal registration of both marks with the U.S. Patent & Trademark Office.

(Declaration of Sam Edelman ¶ 13).

This paragraph of the Declaration seems carefully crafted to avoid including any information to judge the soundness of the purported opinion. Did counsel see Maxwell's product? Did counsel express an opinion as to Edelman's infringement of Maxwell's mark? What was that opinion? How risky did counsel say this course of action was?

- 17 -

Did counsel go through a full and complete analysis of Edelman's sale of the mark to Maxwell for $5.5 million and Edelman's attempt to recapture that goodwill?

There is absolutely no basis from which to conclude that the supposed advice was adequate or that Edelman was justified in relying upon it. While Maxwell pointed out the absence of supporting documentation, see Maxwell Reply Br. at 14, the Recommendation overlooks this deficiency.

The only inference that can reasonably be drawn from Edelman's assertion that he met with counsel before selecting the SAM EDELMAN and SAMMY E marks – much as the court noted in Harland – is that Edelman had Maxwell's marks in mind and was seeking a way to profit from the goodwill that Maxwell had previously purchased and subsequently augmented. Coupled with his failure to notify Maxwell that he intended to adopt these marks or to forthrightly inquire as to whether there was objection, and further taken together with his failed attempt to repurchase the SAM & LIBBY® Mark,[9] the evidence supports a conclusion of bad faith.

### III.   MAXWELL IS ENTITLED TO A PRELIMINARY INJUNCTION.

In determining likelihood of confusion, the Magistrate found only two factors favored Edelman. With the corrected analysis of those two factors as suggested above, seven of the eight factors favor entry of an injunction (and one is neutral).[10]

Maxwell is accordingly entitled to a preliminary injunction because it has demonstrated a likelihood of success on the merits. See Labrador Software, Inc. v.

---

[9] See Monks Dec. at ¶¶ 16-17.

[10] As the Magistrate Judge noted, there is no evidence of actual confusion, but due to the early nature of this case, Edelman's lack of sales, and Maxwell's prompt efforts to protect its rights, this factor is neutral and favors neither party. (Rec. at 9).

Lycos, Inc., 32 F. Supp. 2d 31 (D. Mass. 1999) ("the dispositive issue…is the plaintiff's likelihood of success on the merits").  No separate showing of irreparable harm is required in trademark cases.  See I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998) ("When considering claims based on copyright, trademark or trade dress infringement, irreparable harm may be presumed even in the absence of demonstration of actual injury").[11]

Edelman sold his mark to Maxwell for millions of dollars.  He can and should be restrained from repossessing that goodwill now by using marks confusingly similar to Maxwell's.  His new marks share a common word – the dominant feature of both marks – and are used on the very same kind of product, targeting the same prospective purchasers, in the same price range, marketed in the same way, through the same channels of trade.  Confusion of source, origin, or association is likely.

IV.    CONCLUSION

Maxwell respectfully requests this Court enjoin Edelman from using the marks SAM EDELMAN (or its earlier variant, SAM BY SAM EDELMAN) and SAMMY E in view of Maxwell's longstanding prior rights to SAM & LIBBY®.

---

[11] As is discussed in Maxwell's original memorandum, the public interest likewise favors an injunction if a likelihood of success is shown.  Edelman's claims concerning the balance of hardships ignore the reality that any harm to Edelman is a result of his own doing.  See Maxwell Reply Br. at 14-16 and supra section II.B.

- 20 -

                                        Respectfully submitted,

                                        MAXWELL SHOE COMPANY, INC.

                                        By its attorneys,

Dated: August 24, 2004                  /s/ Michael A. Albert_____
                                              Michael A. Albert (BBO #558566)
                                              malbert@wolfgreenfield.com
                                              Ilan N. Barzilay (BBO #643978)
                                              ibarzilay@wolfgreenfield.com
                                              WOLF, GREENFIELD & SACKS, P.C.
                                              600 Atlantic Ave.
                                              Boston, MA 02210
                                              617.646.8000 phone
                                              617.646.8646 fax